**F & D TRADING CORPORATION and Great Empire Export and Import Corporation**

v.

**The UNITED STATES.**

No. 273–74.

United States Court of Claims.

July 14, 1978.

Robert I. White, Houston, Tex., attorney of record, for plaintiff. Larry A. Campagna and Chamberlain, Hrdlicka, White & Waters, Houston, Tex., of counsel.

David C. Hickman, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and KUNZIG, Judges.

## OPINION

PER CURIAM:

Senior Trial Judge Mastin G. White filed his recommended decision and findings of fact in this case on July 26, 1977. Plaintiffs have not excepted to any of the trial judge's conclusions or findings.* Defendant has excepted to the trial judge's conclusions and his major findings on "The Erroneous Calculation Issue" and "The Tax Burden Issue." Oral argument has been had, and the court has also considered the briefs. Since the court agrees with the trial judge's recommended decision, with minor modifications, as well as with his findings, it hereby affirms and adopts that decision (as modified) and those findings as the basis for its judgment in this case. Accordingly, it is concluded that plaintiff F & D Trading Corporation is entitled to recover $52,192.98, plus statutory interest, and that plaintiff Great Empire Export and Import Corporation is entitled to recover $23,418.67, plus statutory interest. Judgment is entered for plaintiffs in those amounts.

The opinion of Senior Trial Judge White, with minor modifications, follows:

The plaintiffs, F & D Trading Corporation ("F & D") and Great Empire Export and Import Corporation ("Great Empire"), are New York corporations. They sue to recover manufacturer's excise taxes which they severally paid for certain quarters during the 1968–71 period (in the case of F & D) and for certain quarters during the 1969–70 period (in the case of Great Empire). The taxes in question were paid by the respective plaintiffs in connection with the sale in the United States of Volkswagen automobiles which the plaintiffs had purchased in Europe and imported into the United States.

A motion for partial summary judgment was filed by the defendant, and was denied by the court in an order dated November 21, 1975.

The great majority of the Volkswagens imported and sold in the United States during the periods material to this case were imported by a company known as Volkswagen of America, Inc. ("VW of A"). That company was a wholly owned subsidiary of Volkswagenwerk, AG, the West German manufacturer of Volkswagen automobiles; and it was the only company authorized by the manufacturer to import Volkswagens into the United States.

Although Volkswagenwerk, AG, would not sell Volkswagens to anyone other than VW of A for importation and sale in the United States, there were, during the periods involved in this case, approximately 22 companies or individuals that operated in what was known as the "grey market," involving the purchase of Volkswagens in Europe and the importation and sale of such automobiles in the United States. Both F & D and Great Empire were grey market importers of Volkswagens, as were Jattke & Capels and Raymond E. Hemrick (names that will recur later in the opinion). The number of Volkswagens imported into the United States by all the grey market importers was, in the aggregate, relatively small, in comparison with the number imported by VW of A.

Although the plaintiffs and the other grey market importers were unable to purchase Volkswagens directly from the Volkswagen factory in Germany, they were able to purchase new Volkswagens in Europe from Volkswagen regional distributors or from Volkswagen dealers who had available for sale new Volkswagens which they had previously purchased from the factory or from regional distributors.

---

* In particular, plaintiffs have not challenged the trial judge's opinion or recommended decision, adverse to them, on "The Constructive Sale Price Issue."

In order to meet consumer tastes in this country and U.S Government safety standards for vehicles sold within the United States, certain modifications—known in the trade as "Americanization"—had to be made to the basic European Volkswagens. This process consisted of installing safety glass windshields, leatherette vinyl seatcovers, a mileage (rather than a kilometer) speedometer and odometer, and sealed-beam headlights. The Volkswagens imported by VW of A were Americanized by the Volkswagen factory in Germany, while the grey market importers had their vehicles Americanized in free trade zones at various port cities of Western Europe.[1]

The different models of Volkswagens (*e.g.*, sedans and hatchbacks) imported by VW of A into the United States were identical with Volkswagens of the same types imported by F & D, Great Empire, and other grey market importers.

Great Empire sold all of its imported Volkswagens at wholesale to F & D.

Most of the Volkswagens which F & D purchased in Europe and imported into the United States, as well as most of the Volkswagens which F & D purchased from Great Empire, were sold by F & D at wholesale to retailers. Some of F & D's Volkswagens, however, were sold at wholesale to a company known as Drexel Motors, which operated at both the wholesale and retail levels.

All of the Volkswagens imported by VW of A were sold by that company to regional distributors (one-third of which were owned by VW of A). The regional distributors, in turn, resold the automobiles at wholesale to retailers.

*The Constructive Sale Price Issue*

Great Empire, F & D, and VW of A, in computing and paying the quarterly manufacturer's excise taxes on the Volkswagens which they imported and sold in the United States, used as their respective bases the prices at which they sold their imported Volkswagens. This was in accordance with section 4061(a) of the Internal Revenue Code of 1954, I.R.C. § 4061(a)(1970) (amended 1971), which (for the periods involved in this case) imposed an excise tax of 7 percent on automobiles sold in the United States "by the manufacturer, producer, or importer," the tax being based upon "the price for which so sold."

As the Volkswagens imported by VW of A were sold by that company to regional distributors at prices that were somewhat less than the prices at which the plaintiffs sold their imported Volkswagens (VW of A obviously enjoyed an economic advantage as the wholly owned subsidiary of the manufacturer, selling to regional distributors), the manufacturer's excise tax which VW of A paid on the sale of its imported Volkswagens was accordingly less than the tax which F & D or Great Empire was required to pay on the sale of identical types of Volkswagens.

In the present case, F & D and Great Empire contend, *inter alia,* that they were each entitled to use, for excise tax purposes, a constructive sale price based upon the price at which VW of A sold identical Volkswagens of the same types. In support of this contention, the plaintiffs cite the legislative history of the manufacturer's excise tax and state in part that "Congress made it clear that the tax was intended as (1) a manufacturers' tax, (2) the basis of which would be a price that would reflect normal manufacturing costs and (3) that the wholesale price, adjusted if necessary to exclude non-manufacturing costs, ordinarily would be such a price"; and, further, that "Any departure from the use of a uniform manufacturer's excise tax base, where such a base was readily determinable among members of a single competitive group, obviously results in discrimination." They conclude this line of argument with the following paragraph:

VWoA's wholesale sales price more nearly approaches "costs of manufacture" than Great Empire's price or F & D's

---

1. The grey market importers were able to purchase some Volkswagens which had been specially manufactured for sale in Europe to American servicemen or tourists. These vehicles did not require Americanization prior to their importation into the United States.

price. That is obvious. VWoA is an arm of the German factory and sells * * * [the great majority] of the Volkswagens sold in the United States. F & D and Great Empire are in the same business as VWoA and have to set their prices to compete with VWoA's prices. Why should the government be permitted to discriminate in application of the MET [manufacturer's excise tax] so as to deprive F & D and Great Empire of the possibility of making profits?

█ Unfortunately for the plaintiffs' contention on this point, the court does not have the prerogative of ignoring the plain language used by Congress in order to achieve a result which (according to the plaintiffs) would be more rational and fair than that flowing from the application of the literal statutory language. Section 4061(a) of the 1954 Code states that the excise tax of 7 percent on automobiles sold in the United States "by the manufacturer, producer, or importer" is to be based upon "the price for which so sold"; and the syntax plainly indicates that it is the price for which the particular "manufacturer, producer, or importer"—whether it be VW of A, or F & D, or Great Empire—sells the automobiles that provides the base for the computation of the tax to be paid by the seller. (Although section 4216(b) of the 1954 Code, I.R.C. § 4216(b)(1970) (amended 1971), permits the use of a constructive sale price under certain circumstances, that section is not pertinent to the present discussion.)

█ The Supreme Court has said that the words of statutes, including revenue acts, should be interpreted, where possible, in their ordinary, everyday senses. *Crane v. Commissioner,* 331 U.S. 1, 6, 67 S.Ct. 1047, 91 L.Ed. (1947). Under that criterion the court is required in the present case to apply the literal statutory language and to reject the plaintiffs' contention that they were entitled to compute their manufacturer's excise tax on a constructive sale price based upon the price at which VW of A sold its imported Volkswagens, rather than upon their own actual sale price.

As a fall-back position, the plaintiffs assert that they were entitled to use, for excise tax purposes, a constructive sale price based upon the same formula which Jattke & Capels or Raymond E. Hamrick used in computing the manufacturer's excise tax on sales of imported Volkswagens of the same types as those sold by the plaintiffs.

Jattke & Capels was a grey market importer of Volkswagens into the United States from Europe and a competitor of F & D and of Great Empire. The Volkswagens imported by Jattke & Capels were sold by that company at wholesale to retailers. The evidence in the record shows that sometime prior to April 29, 1965, a representative of Jattke & Capels orally requested that Roland L. Wolfe, a representative of the U. S. Internal Revenue Service stationed in London, England, furnish to him information as to the price of Volkswagens shipped to the United States on which the manufacturer's excise tax should be computed. Mr. Wolfe responded to this inquiry in writing on April 29, 1965, and stated in part as follows:

> [I]t seems that the price of the automobile plus Americanization should be considered the sales price for the purpose of the excise tax and the excise tax should not be computed on the delivery, forwarding fee, insurance, finance charges and freight. There is a requirement, however, that when the amount billed separately as freight is in excess of the actual transportation charge only the amount billed as freight in excess of the actual charge is taxable as part of the sales price.

As the advice which the IRS representative gave to Jattke & Capels was inconsistent with the plain language of section 4061(a) of the 1954 Code, previously discussed, such advice was erroneous. Nevertheless, Jattke & Capels followed such advice; and, at times material to this litigation, the manufacturer's excise tax which Jattke & Capels paid on the Volkswagens which that company imported from Europe and sold in the United States was based

upon the price at which the vehicles were purchased in Europe, plus the cost of Americanizing the vehicles.

Raymond E. Hamrick was also a grey market importer of Volkswagens into the United States from Europe, and he was a competitor of F & D and of Great Empire. He conducted his business in Florida. Some of Mr. Hamrick's imported Volkswagens were sold by him at wholesale to retailers, and others were sold by him at retail to consumers. In the early 1960's, Mr. Hamrick was orally advised by a local Internal Revenue Agent that he should use 75 percent of his actual sale price as the base on which to compute the manufacturer's excise tax on the Volkswagens which he imported from Europe and sold in this country. This advice was erroneous insofar as Mr. Hamrick's sales at wholesale to retailers were concerned. Nevertheless, during periods involved in the present litigation, Mr. Hamrick continued to use the formula of 75-percent-of-sale-price in computing the manufacturer's excise tax on his sales of imported Volkswagens at wholesale to retailers.

■ The Internal Revenue Service was not required to permit the present plaintiffs to discharge their manufacturer's excise tax liability on the basis of erroneous advice which lower-echelon personnel of the IRS gave to other taxpayers. In the first place, the record is wholly devoid of evidence tending to show that either the IRS representative in London or the Internal Revenue Agent in Florida was authorized to act for the Commissioner of Internal Revenue in issuing revenue rulings. It is well established that the Government is not bound by the unauthorized acts of its agents, and is not estopped to assert the lack of authority as a defense. *Bornstein v. United States,* 170 Ct.Cl. 576, 582, 345 F.2d 558, 562 (1965).

■ Furthermore, even if the erroneous advice that was given to Jattke & Capels and to Raymond E. Hamrick had been in the nature of revenue rulings, such rulings, being based upon erroneous statutory interpretations, could subsequently have been corrected by the Internal Revenue Service and the corrections could have been applied retroactively to the recipients of the erroneous advice. The doctrine of equitable estoppel is not a bar to the correction by the IRS of a mistake of law. *Automobile Club v. Commissioner,* 353 U.S. 180, 183, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); *cf. Exchange Parts Co. v. United States,* 150 Ct.Cl. 538, 543, 279 F.2d 251, 254 (1960).

■ In any event, assuming *arguendo* that the erroneous advice to Jattke & Capels and to Raymond E. Hamrick could be considered as revenue rulings, such rulings, being unpublished, could not be relied on by third persons, such as the present plaintiffs, who had not themselves requested a ruling. *Bornstein v. United States,* 170 Ct.Cl. at 584–86, 345 F.2d at 563–64; *cf. International Business Machines Corp. v. United States,* 170 Ct.Cl. 357, 343 F.2d 914 (1965), *cert. denied,* 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966).

■ Another contention made by the plaintiff F & D is to the effect that, in computing its manufacturer's excise tax on all sales of imported Volkswagens, it was entitled to base the computation on the highest sale price of such vehicles to Drexel Motors.

It has been stated previously in the opinion that F & D sold most of its imported Volkswagens to retailers, but sold some of the imported vehicles to Drexel Motors, a company that operated both as a wholesaler selling automobiles to retailers and as a retailer selling automobiles directly to consumers. F & D made nine sales of imported Volkswagens to Drexel Motors in 1968, seven sales in 1969, one sale in 1970, and one sale in 1971.

Because of the sales to Drexel Motors, F & D relies on section 4216(b)(2) of the 1954 Code, I.R.C. § 4216(b)(2) (1970) (amended 1971), which provides as follows:

(2) Special rule.

If an article is sold at retail or to a retailer, and if—

(A) the manufacturer, producer, or importer of such article regularly sells such articles at retail or to retailers, as the case may be,

(B) the manufacturer, producer, or importer of such article regularly sells such articles to one or more wholesale distributors in arm's length transactions and he establishes that his prices in such cases are determined without regard to any tax benefit under this paragraph,

(C) in the case of articles upon which tax is imposed under section 4061(a) (relating to automobiles, trucks, etc.), the normal method of sales for such articles within the industry is not to sell such articles at retail or to retailers, or combinations thereof, and

(D) the transaction is an arm's length transaction,

the tax under this chapter shall (if based on the price for which the article is sold) be computed on whichever of the following prices is lower: (i) the price for which such article is sold, or (ii) the highest price for which such articles are sold by such manufacturer, producer, or importer to wholesale distributors (other than special dealers).

This particular argument of F & D cannot be accepted because, as previously stated, Drexel Motors operated both as a wholesaler and as a retailer, and the evidence in the record does not show whether the Volkswagens which F & D sold to Drexel Motors were, in turn, resold by Drexel Motors at wholesale to retailers or at retail directly to consumers. In purchasing Volkswagens from F & D, Drexel Motors may well have been acting as a retailer acquiring vehicles for resale to consumers. Also, in view of the number of sales by F & D to Drexel Motors, particularly the single sale in 1970 and the single sale in 1971, it would be difficult to find that such sales were made "regularly." Consequently, in connection with this particular point, F & D failed to meet its burden by proving that it "regularly" sold imported Volkswagens to "one or more wholesale distributors."

For the reasons stated in this part of the opinion, neither F & D nor Great Empire was entitled to use a constructive sale price in computing the manufacturer's excise tax due on the sale of imported Volkswagens.

*The Erroneous Calculation Issue*

■ The quarterly manufacturer's excise tax returns were prepared for Great Empire and for F & D by Morris Schuller, a certified public accountant. In addition to performing accounting services for both of these companies, Mr. Schuller participated in the business activities of F & D to the extent of sometimes acting for F & D in making sales of automobiles imported by that company. Also, on at least one occasion, Mr. Schuller acted for F & D in purchasing automobiles for importation into the United States.

In order to prepare the quarterly manufacturer's excise tax returns for Great Empire and for F & D, Mr. Schuller would go to the offices of these companies. Prior to Mr. Schuller's visits to the companies' offices, Irwin Losch, an employee of each company, working from the companies' invoices of sales, would prepare adding machine tapes calculating the total dollar value of the taxable sales of imported Volkswagens made by each company during the particular quarter. As the invoices did not reflect both a sale price and an excise tax, but, rather, only a sale price, Mr. Schuller calculated the tax liability to be shown on a particular return by dividing the total dollar amount shown on the pertinent tape by 107, and then multiplying the quotient by 7. The product calculated in this fashion was inserted on the quarterly manufacturer's excise tax return for the particular company, F & D or Great Empire, and a check remitting the tax shown to be due was sent to the Internal Revenue Service with the return.

The preponderance of the evidence in the record shows that Irwin Losch—for reasons that can only be surmised, as Irwin Losch is dead—made errors in preparing the adding machine tapes of the quarterly invoices of F & D and of Great Empire which he prepared for Morris Schuller and which were used by the latter as the basis for computing the quarterly manufacturer's excise tax owed by each company. Mr. Losch included in

his quarterly totals of supposedly taxable sales by F & D and by Great Empire some sales which, according to the preponderance of the evidence in the record, were not taxable.[2] As the inflated totals of supposedly taxable sales were used by Morris Schuller in preparing the quarterly manufacturer's excise tax returns for F & D and for Great Empire, Mr. Schuller's calculations as to the taxes due by F & D and by Great Empire were, therefore, erroneously high.

As indicated in finding 9(b), the errors mentioned in this part of the opinion resulted in overpayments of the manufacturer's excise tax by Great Empire in the total amount of $23,418.67, and in overpayments by F & D in the total amount of $52,192.98.

### The Tax Burden Issue

As it has been determined in the immediately preceding part of this opinion that the plaintiffs made overpayments of the manufacturer's excise tax, it becomes necessary to consider whether the plaintiffs themselves bore the economic burden of the tax overpayments or shifted such burden to the purchasers of the imported Volkswagens.

In this connection, section 6416(a) of the 1954 Code, I.R.C. § 6416(a), provides in part as follows:

(a)   Condition to allowance.

(1)   General rule.

No credit or refund of any overpayment of tax imposed by  *  *  * chapter 32 (manufacturers taxes), shall be allowed or made unless the person who paid the tax establishes  *  *  * that he—

(A)   has not included the tax in the price of the article with respect to which it was imposed and has not collected the amount of the tax from the person who purchased such article *   *.

When F & D or Great Empire sold imported Volkswagens, the sale price was always the result of negotiations between the seller and the purchaser; and, in effect, the sale price was set to meet the then-current price being charged by competitors, principally VW of A and Jattke & Capels. There was never an instance where a sale price of Volkswagens was first negotiated between F & D or Great Empire and a purchaser, and an amount to cover the excise tax on the sale was then added to the purchase price. Actually, there was never any discussion in the negotiations over the sale price as to who would bear the economic burden of the manufacturer's excise tax. To F & D and Great Empire, the manufacturer's excise tax was one of the costs involved in doing business; and they always endeavored to negotiate a sale price which would cover all costs, including the cost of purchasing the vehicles in Europe, the cost of Americanization, the cost of transportation from Europe, and the cost of the excise tax, and which would leave a margin for profit. No separate excise tax amount ever appeared on an F & D or Great Empire invoice (although the printed invoices contained the general statement, "excise tax included").

Neither F & D nor Great Empire ever collected any dollars that were identified in any way as manufacturer's excise tax, nor did they keep any account of manufacturer's excise tax liability on their books.

Also, as stated in another part of the opinion, the amount of the manufacturer's excise tax on sales of imported Volkswagens was never computed when the sales were made. Instead, after the close of a particular quarter, a certified public accountant computed the amount of the manufacturer's excise tax payable by F & D or by Great Empire on all sales made during the quarter. He did so by dividing each company's total dollar volume of sales by 107, and then multiplying the quotient by 7.

---

**2.** Possible explanations for the errors is that Irwin Losch included in his quarterly totals for F & D some sales of Volkswagens which F & D had purchased from Great Empire and on which the latter company paid the manufacturer's excise tax; and that he included in his quarterly totals for both F & D and Great Empire some sales which were not concluded during the particular quarter.

This computation was made, of course, after the various prices had been determined and fixed through negotiations; and the later determination of the amount of excise tax due did not affect in any way the amount of the sale price negotiated in the various sale transactions during the quarter.

It appears, therefore, that each plaintiff absorbed the manufacturer's excise tax as one of the costs of doing business, and "has not included the tax in the price of the article with respect to which it was imposed and has not collected the amount of the tax from the person who purchased such article," within the meaning of this language as used in section 6416(a) of the 1954 Code.

### Conclusion

It is my opinion that, because of the erroneous computations, (1) the plaintiff F & D is entitled to recover $52,192.98 (plus statutory interest), and (2) the plaintiff Great Empire is entitled to recover $23,418.67 (plus statutory interest).