**Raymond E. HAMRICK**
v.
**The UNITED STATES.**
No. 257–72.
United States Court of Claims.
Oct. 18, 1978.

---

Robert I. White, attorney of record, Houston, Tex., for plaintiff; William W. Edelman, Houston, Tex., of counsel.

David C. Hickman, Washington, D. C., with whom was Asst. Atty. Gen., M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and KUNZIG, Judges.

## OPINION

DAVIS, Judge:

Raymond E. Hamrick sues to recover manufacturer's excise taxes which he paid during 1964–66 in connection with the sale in the United States of new Volkswagen automobiles that he had imported from Europe. The defendant counterclaims for additional excise taxes.

Mr. Hamrick, the claimants in *F & D Trading Corp. v. United States*, No. 273–74, decided July 14, 1978, 580 F.2d 414, a company known as Jattke & Capels, and certain other companies were "grey market" importers of Volkswagen automobiles into the United States from Europe during the 1960's. The grey market importers competed with each other in selling the imported Volkswagens, and they also competed with Volkswagen of America, Inc. ("VW of A"), which was a wholly owned subsidiary of Volkswagenwerk, AG, the West German manufacturer of Volkswagens. VW of A was the only factory-authorized importer of Volkswagens into the United States, and it handled the great bulk of the business. Although they grey market importers could not purchase Volkswagens from the manufacturer, they were able to purchase new Volkswagens in Europe from Volkswagen regional distributors or from Volkswagen dealers who had available for sale Volkswagens which they had previously purchased from the factory or from regional distributors.

In order for Volkswagens to be imported and sold in the United States, it was necessary for the vehicles to be "Americanized." This involved the installation of safety glass windshields, leatherette vinyl seat covers, a mileage (rather than a kilometer) speedometer and odometer, and sealed-beam headlights. The Volkswagens imported by VW of A were Americanized by the factory in Germany, and the Volkswagens imported by the grey market importers were Americanized in free trade zones at various port cities of Western Europe. The Americanized Volkswagens imported and sold by Mr. Hamrick and other grey market importers were identical with those imported and sold by VW of A.

Unlike VW of A, Jattke & Capels, and the claimants in the *F & D Trading Corp.* case, all of whom sold their imported Volkswagens exclusively at wholesale, plaintiff Hamrick sold some of his imported Volkswagens at retail directly to consumers. He also sold at wholesale to retailers but not to wholesale distributors.

Mr. Hamrick conducted his business in Florida. Sometime in the early 1960's, he was advised by a local Internal Revenue Agent that he should use 75 percent of the sale price of the imported Volkswagens sold during a particular quarter as the base on which to compute his quarterly manufacturer's excise tax liability on such sales. Subsequently, and continuing through part of the period involved in the present litigation, Mr. Hamrick used the 75-percent-of-sale-price formula in computing and paying his manufacturer's excise tax liability, both with respect to the sale of imported Volkswagens at retail to consumers and the sale of Volkswagens at wholesale to retailers.

In the spring of 1965, Mr. Hamrick obtained a copy of a letter which a representative of the U.S. Internal Revenue Service stationed in London, England, had written on April 29, 1965, to Jattke & Capels, one of Mr. Hamrick's grey market competitors in the sale of imported Volkswagens. In that letter, the IRS representative informed Jattke & Capels that the manufacturer's excise tax on Volkswagens purchased in Europe and imported into the United States should be based upon the purchase price of the vehicles in Europe, plus the cost of Americanizing the vehicles. Beginning in about June 1965, and in reliance on the letter to Jattke & Capels, Mr. Hamrick began calculating and paying his manufacturer's excise tax liability on the basis of the cost of purchasing the Volkswagens in Europe, plus the cost of Americanizing the automobiles.

In 1968, the Internal Revenue Service examined Mr. Hamrick's manufacturer's excise tax returns for the period from October 1, 1964, through March 31, 1966, and determined that Mr. Hamrick owed $12,465 of additional excise tax. This deficiency, which prompted the defendant's counterclaim in the present case, was calculated: (1) by using as a tax base the actual sale price for those Volkswagens which Mr. Hamrick sold at wholesale to retailers; and (2), for those Volkswagens sold at retail to consumers, by using as a tax base the average sale price of comparable automobiles

sold by Mr. Hamrick at wholesale to retailers. Thus, the Service held that it was erroneous for Mr. Hamrick to have used the 75-percent-of-sale-price formula prior to June 1965 in determining his manufacturer's excise tax liability, and also erroneous to have used the purchase price of the Volkswagens in Europe, plus the cost of Americanizing the vehicles, as the base on which to compute his manufacturer's excise tax liability beginning in June 1965.

At the present stage of the litigation (*i. e., before the judges*), plaintiff contends that he was entitled to use, for his sales to consumers, a constructive sale price (under I.R.C. § 4216(b)(1)) based upon the wholesale price at which his main competitor, VW of A, sold identical Volkswagens of the same types as those sold by him. For his sales to retailers, he urges that the "special" constructive sale price provided in I.R.C. § 4216(b)(2) (1964) (amended 1965, 1971) was available to him on the basis of the constructive sale price he urges for the tax on his retail sales.[1] We discuss and reject both of these positions.

*Retail sales to consumers:* The automobile excise tax is generally imposed, I.R.C. § 4061(a) (1964) (amended 1971), on "the manufacturer, producer, or importer" at a specified percent of the price for which the article is sold by him in the United States. *See F & D Trading Corp. v. United States,* Ct.Cl. No. 273–74, 580 F.2d at 417, decided July 14, 1978. However, in certain circumstances two alternative "constructive sale prices" are available under § 4216(b)(1) and (b)(2). With respect to Mr. Hamrick's sales at retail to consumers, defendant now concedes that he was entitled under § 4216(b)(1) and Rev.Rul. 68–202, 1968–1 Cum.Bull. 477, to utilize a constructive sale price consisting of 75 percent of his actual retail sale price or cost plus ten percent, whichever was higher.[2] Section 4216(b)(1), *see* note 2, *supra,* establishes that, in the case of an article sold at retail, the constructive sale price shall be the *lower* of "(i) the price for which such article is sold, or (ii) the highest price for which such articles are sold to wholesale distributors in the ordinary course of trade, by manufacturers or producers thereof, *as determined by the Secretary or his delegate*" (emphasis added). We are concerned here only with the second prong; both sides agree that that standard provides in this case a lower base than the price for which plaintiff sold his Volkswagens at retail. The dispute is over the extent of the difference. As we have pointed out (note 2, *supra*), the Service held in Rev.Rul. 68–202 that the highest price for which automobiles were sold to wholesale distributors in the ordinary course of trade by manufacturers or producers was the higher of 75% of actual sale price or total cost plus 10%. Plaintiff challenges that Ruling as controlling his case, while defendant says that the Ruling governs.

1. Mr. Hamrick does not now contend that he was entitled to use the so-called Jattke and Capels tax base (which we have already rejected, *see F & D Trading Corp. v. United States,* Ct.Cl. No. 273–74, 580 F.2d at 418–419 (1978)).

2. Section 4216(b)(1) provides as follows:
"*Constructive Sale Price.*
(1) *In General.*—If an article is—
   (A) sold at retail,
   (B) sold on consignment, or
   (C) sold (otherwise than through an arm's length transaction) at less than the fair market price, the tax under this chapter shall (if based on the price for which the article is sold) be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary or his delegate. In the case of an article sold at retail, the computation under the preceding sentence shall be on whichever of the following prices is the lower: (i) the price for which such article is sold, or (ii) the highest price for which such articles are sold to wholesale distributors, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary or his delegate. This paragraph shall not apply if paragraph (2) applies."
Rev.Rul. 68–202, 1968–1 Cum.Bull. 477, provided that for sales at retail the constructive sales price under § 4216(b)(1)(ii) was the higher of (a) 75 percent of the actual sales price or (b) the total cost plus ten percent. The Ruling directly relates to trailer chassis and bodies, but has been applied to other types of automobiles where the seller has no "established retail price."

Three significant aspects of the "constructive sale price" for sales at retail, as permitted by § 4216(b)(1), should be marked at the outset. *First* is that the "constructive sale price" is only applicable if it is lower than the price for which the taxpayer actually sold the article on which the tax is imposed; the actual sale price sets the maximum base for the tax and the "constructive sale price" is an alternative only if it is advantageous to the taxpayer, resulting in a smaller tax. *Second,* the section expressly gives to the Treasury Department the power to determine the "constructive sale price," *i. e.,* "the highest price for which such articles are sold to wholesale distributors, in the ordinary course of trade, by manufacturers or producers thereof." *Third,* this legislative formulation of the "constructive sale price" is far from precise, presenting several substantial ambiguities not resolved by the bare words of the statute.[3]

Hamrick's position, with respect to his retail sales, is that he is entitled to the "constructive sale price" under § 4216(b)(1)[4] computed on the basis at which Volkswagens were sold by VW of A, by far the largest importer and seller of Volkswagens in this country, in its sales to its wholesalers. If that were the applicable basis, plaintiff might be entitled to a refund and in any event would probably be free from the defendant's counterclaim with respect to sales to consumers (*i. e.,* at retail).

■ We stumble over this contention of plaintiff's because § 4216(b)(1) authorizes "the Secretary or his delegate"—not the court—to determine "the highest price for which *such articles* are sold to wholesale distributors" (emphasis added). The stat-

ute does not seem to require the "Secretary or his delegate" to limit "such articles" to the narrow class of imported Volkswagens; so far as we can now tell, the Treasury has substantial leeway (within rational bounds) to take account—in fixing the highest price for which *"such* articles" are sold—of all vehicles, or all passenger vehicles, or some other class of vehicles less than all but broader than the minor category of imported Volkswagens. The statute does not prescribe the exact perimeters of the "such articles" which are to be used as the measuring rod, and the Treasury, since Congress gave it the authority to determine, must have reasonable discretion in defining "such articles."

■ On what has been presented to us, we cannot say that IRS has abused its discretion in Rev.Rul. 68–202, *supra.* Plaintiff simply assumes, without argument or proof, that the only accepted comparison is with the sale of other imported Volkswagens; he makes no effort whatever to show that the Service could not properly make a comparison with other cars or vehicles, or that the standard of the Revenue Ruling would be wrong if such a broader category were taken as the basis of comparison.[5] For its part, the defendant suggests, though it does not represent, that, in establishing the formula set forth in the Revenue Ruling, the Service took into consideration a wide spectrum of motor vehicles of all types and sought to ascertain the general mark-up percentage between sales to wholesale distributors and sales to consumers.

This being the state of the record, we are in no position to upset the Revenue Ruling

**3.** For example, the scope of the terms "such articles" and of "ordinary course of trade" is not clear. Another problem is whether "manufacturers or producers thereof" includes importers in this context. Other portions of the statute (*see, e. g.,* § 4061(a), imposing the tax and § 4216(b)(2), providing a "special rule" for certain taxpayers) use "manufacturer, producer, or importer" but § 4216(b)(1)(ii) employs only "manufacturers or producers." We have not seen any regulation or ruling—or other authoritative indication—showing the position

of IRS as to whether the term "importer" can or should be introduced into this particular part of § 4216(b)(1)(ii) as an addition to "manufacturers or producers."

**4.** Plaintiff does not claim, for his retail sales, the special "constructive sale price" established by § 4216(b)(2).

**5.** Plaintiff had full opportunity to make his factual case before the trial judge and his legal case at that level as well as before us.

as arbitrary, capricious, in excess of proper discretion, or based upon an incorrect view of the statute. Much more would have to be shown to overturn the determination by the agency explicitly endowed by Congress with the power to decide this alternative "constructive sale price," under a statutory standard as imprecise in its terms and application as the one in § 4216(b)(1)(ii).[6]

Plaintiff insists that Rev.Rul. 68–202 should not be considered the Treasury "determination" contemplated by § 4216 (b)(1)(ii). But the Commissioner of Internal Revenue, as the delegate of the Secretary of the Treasury, has for many years made similar determinations in the form of Revenue Rulings. Section 4216(b)(1)(ii) does not prescribe the form of the "determination," and the Service's "consistent pattern of administrative construction of § 4216(b)(1)" has been accepted as a practical interpretation and application of the statute, *Whattoff v. United States*, 355 F.2d 473, 477–78 (8th Cir. 1966); *see also Smith v. United States*, 319 F.2d 776, 781 (5th Cir. 1963). We agree.[7]

Nor can plaintiff rightfully invoke *Smith v. United States, supra,* 319 F.2d at 781, as calling for rejection of the Revenue Ruling. In that case, the Government argued that a "constructive sale price" under § 4216(b)(1)(ii) could not be applied to used cars. In turning down that position of the Department of Justice, the Fifth Circuit did not overrule any Revenue Ruling or any Service "determination" under § 4216(b)(1) (ii); the court simply held that the section did not, under its wording and as generally applied by the Service, exclude used cars entirely from the privilege of that "constructive sale price." It deserves mention, too, that, in directing the determination by the District Court of the constructive sale price for the used cars, the Court of Appeals employed the same general formula as the IRS—a percentage of the retail price.[8]

We conclude, then, that Rev.Rul. 68–202 provides in this case the proper basis for computing plaintiff's tax on his retail sales and that, under that formula, he is not entitled to recover but may possibly have underpaid his tax; and if so, the defendant is entitled to recover on its counterclaim with respect to his retail sales.

*Sales to retailers:* For sales to retailers, § 4216(b)(2) provides a special "constructive sale price" to those taxpayers who meet the conditions of that sub-subsection.[9] Mr. Hamrick presents an intricate

---

**6.** Specifically, we cannot say, on the basis of the present record, that (a) plaintiff, in selling "grey market" Volkswagens, competed only with other sellers of Volkswagens and not with other sellers of passenger cars (or of smaller passenger cars); (b) § 4216(b)(1)(ii) compelled IRS to base its determination solely on the experience of VW of A which was an importer, not a "manufacturer" or "producer"; or (c) that Rev.Rul. 68–202 could not properly compute "ordinary" sales to wholesale distributors by reducing the retail price by what was deemed to be the normal markup percentage in the vehicle-selling industry (or by adding 10% to the cost of the article).

**7.** No court has held that the "determination" called for by § 4216(b)(1)(ii) could not be made by Revenue Ruling.

**8.** The holding in *Quaker City Iron Works, Inc. v. United States*, 256 F.Supp. 450, 453–54 (E.D. Pa.1966), is also not pertinent. The vice there was that the taxpayer was selling far below cost and its cost was more than 75% of retail price; in that situation the predecessor Revenue Ruling required it to pay tax on the basis of the full retail price. In Mr. Hamrick's instance, no loss was incurred (sales were not below cost), and the *Quaker City Iron Works* problem does not arise. The opinion in that case suggests, *id.* at 455, that the percentage formula of the Revenue Ruling is appropriate where sales below cost are not involved—as in the present case.

**9.** Section 4216(b)(2) (1964) (amended 1965, 1971) provides:
"(2) *Special Rule.*—If an article is sold at retail or to a retailer, and if—
(A) the manufacturer, producer, or importer of such article regularly sells such articles at retail or to retailers, as the case may be,
(B) the manufacturer, producer, or importer of such article regularly sells such articles to one or more wholesale distributors in arm's length transactions and he establishes that his prices in such cases are determined without regard to any tax benefit under this paragraph,
(C) in the case of articles upon which tax is imposed under section 4061(a) (relating to automobiles, trucks, etc.), the normal method

argument that he can properly take advantage of that provision, but on this point he simply cannot avoid the statutory barrier raised by § 4216(b)(2)(B) (*see* note 9, *supra*) which makes it a necessary condition for application of this alternative "special rule" that "the manufacturer, producer, or importer of such article regularly sells such articles to one or more wholesale distributors in arm's length transactions * * *." Plaintiff concedes that he himself made no such sales during the relevant period.[10] Yet the express wording of the subsection and its legislative history both demonstrate that Congress intended this "special rule" to apply only where the *same* manufacturer, producer, or importer also made regular sales to wholesale distributors. *See* H.R.Rep. No. 481, 85th Cong., 2d Sess., 22 (1958–3 Cum. Bull. 372, 393). This concurrence of unmistakable statutory language and indication of Congressional purpose is too strong to be overcome by general appeals to "fairness."[11] Obviously, express and intended provisions of the Internal Revenue Code cannot be disregarded by courts merely because the judges can conceive of some solution which seems "fairer" to them. *See, e. g., F & D Trading Corp. v. United States,* Ct.Cl. No. 273–74, 580 F.2d at 417–18 (1978). Congress is the forum for such rectifica-

tions. In this case, moreover, we have word from Congress that, when it added the "special rule" of § 4216(b)(2), it was not attempting in that provision to achieve fully the goal of imposing manufacturers taxes on a completely uniform basis; administrative problems were thought to prevent the reaching of full equality. *See* H.R.Rep. No. 481, 85th Cong., 2d Sess., 21 (1958–3 Cum.Bull. 372, 392).[12]

■ The result, on this phase of the case, is that the only provision of the Code covering plaintiff's sales to retailers was I.R.C. § 4061(a), *supra*, declaring that the excise tax on automobiles sold in the United States by an importer is to be based on the price for which the importer sold them. It is undisputed that Hamrick did not pay taxes on that basis on his sales to retailers, during the years in suit, but on a lesser basis. Accordingly, he is not entitled to recover, but defendant can recover on its counterclaim. The amount of the Government's recovery, considering both aspects of the case, will have to be determined under Rule 131(c).

## FINDINGS OF FACT

The court, having considered the evidence, the decision and findings of Senior

---

of sales for such articles within the industry is not to sell such articles at retail or to retailers, or combinations thereof, and

(D) the transaction is an arm's length transaction, the tax under this chapter shall (if based on the price for which the article is sold) be computed on whichever of the following prices is the lower: (i) the price for which such article is sold, or (ii) the highest price for which such articles are sold by such manufacturer, producer, or importer to wholesale distributors."

10. His contention, boiled down, is that he had the "definitional equivalence" of such sales to wholesalers because § 4216(b)(1) entitles him (in his view) to a basis for his retail sales predicated on the price VW of A sold cars to *its* wholesale distributors. Plaintiff's position is that the tax base for sales at retail, for sales to retailers, and for sales to wholesalers should be the same under the statute, at least where the retail base is calculated (as he thinks it should be for him) on the price the vehicles are sold to wholesale distributors by the seller he conceives to be his dominant competitor.

11. Mr. Hamrick points out that, if § 4216(b)(2) is taken literally as defendant urges, he could be paying a higher tax on his sales to retailers (*i. e.*, based on the actual sale price to retailers) than on his retail sales (computed under the "constructive sale price" formula of Rev.Rul. 68–202). He does not claim that it would be unconstitutional for Congress to impose the tax on such a disparate basis.

12. The House Committee report makes it clear that the requirement that the same manufacturer, producer or importer regularly make sales to wholesalers was deliberately adopted *in order to avoid the administrative burdens of* having to construct, from the experience of other sellers, a hypothetical base for imposition of the tax. But where sales to wholesalers are regularly made by the *same* taxpayer, "a basis for constructing a price for the manufacturers' sales at retail and to retailers will be readily available." *See* H.R.Rep. No. 481, *supra*, at 21–22 (1958–3 Cum.Bull. at 392–93).

Trial Judge Mastin G. White, and the briefs and arguments of counsel, makes findings of fact as follows:

1. Plaintiff, Raymond E. Hamrick ("Mr. Hamrick"), is an individual and a citizen of the United States. He has been a resident of Jacksonville, Duval County, Florida, since 1941.

2. (a) During the period 1959 through 1966, Mr. Hamrick was the southeastern regional distributor (for eight States) and a retail dealer for the SAAB automobile ("SAAB"), a vehicle manufactured in Sweden. Mr. Hamrick had retail locations in Jacksonville and Coco Beach, Florida.

(b) To complement the SAAB line, Mr. Hamrick imported and sold new Volkswagen vehicles ("Volkswagens"), both through his retail SAAB outlets and to SAAB dealers in the southeast United States. He also sold Volkswagens to franchise Volkswagen dealers. Thus, Mr. Hamrick, during the period involved in this suit, sold both SAABs and Volkswagens at retail and at wholesale to retailers.

3. (a) Mr. Hamrick's sale of SAABs was not subject to the manufacturer's excise tax ("MET") imposed by section 4061 of the Internal Revenue Code of 1954, as Mr. Hamrick purchased those vehicles in the United States.

(b) However, Mr. Hamrick was the importer of the Volkswagens, having purchased them in Europe; and his sales of Volkswagens were thus subject to the MET imposed by section 4061.

4. Volkswagens imported into the United States for resale during the 1960–71 period came through two channels. The primary source was Volkswagen of America, Inc. ("VW of A"), the wholly owned subsidiary and only factory-authorized importer of the West German Volkswagen manufacturer, Volkswagenwerk, AG. The great majority of all Volkswagens imported and sold in the United States were brought in and sold by VW of A. After importation into the United States, VW of A sold these Volkswagens to 14 regional distributors, five·of which were wholly-owned subsidiaries of VW of A. These regional distributors, in turn, resold the Volkswagens to retail dealers, who sold them to consumers.

5. (a) The remaining relatively small percentage of the Volkswagens imported and sold in the United States were brought in and sold by importers such as Mr. Hamrick and about 21 others. All of these importers were known in the trade as "grey market" importers. The mechanics of purchasing cars and the marketing structure followed by Mr. Hamrick and the other grey market importers are indicated in paragraph (b) of this finding.

(b) As VW of A was the only factory-authorized importer of Volkswagens in the United States, it was impossible for other individuals or companies to purchase, for importation into the United States, Volkswagens directly from the Volkswagen factory in Germany. However, Mr. Hamrick and his grey market competitors were able to purchase new Volkswagens in Europe from Volkswagen regional distributors or from Volkswagen dealers who had available for sale new Volkswagens which they had previously purchased from the Volkswagen factory or from regional distributors.

6. (a) To meet consumer tastes and United States Government safety standards for vehicles sold within the United States, certain modifications, known in the trade as "Americanization," had to be made to the basic European Volkswagens. This process consisted of installing safety glass windshields, leatherette vinyl seat covers, a mileage (rather than a kilometer) speedometer and odometer, and sealed-beam headlights.

(b) The vehicles imported by VW of A were "Americanized" at the Volkswagen factory in Germany.

(c) The Volkswagens purchased in Europe by Mr. Hamrick and other grey market importers were either manufactured for the United States market (for sale in Europe to either American servicemen or tourists) or were European models. The European models were Americanized in free trade zones at port cities of Western Europe utilized by the various purchasers. The average Americanization cost on European models was from $55 to $65 per automobile.

(d) The United States market Volkswagens and the Americanized European models purchased by Mr. Hamrick were shipped to the United States by him.

(e) The Americanized Volkswagens imported and sold by Mr. Hamrick and other grey market importers were identical with those imported and sold by VW of A.

7. During the quarters involved in the present case, Mr. Hamrick sold the Volkswagens he imported as follows:

| Quarter | | Volkswagens Sold at Retail | | Volkswagens Sold to Retailers | |
|---|---|---|---|---|---|
| | | No. | $ Volume | No. | $ Value |
| 4th | 1964 | 0 | 0 | 116 | $195,455.00 |
| 1st | 1965 | 11 | 22,670.45 | 78 | 133,600.00 |
| 2d | 1965 | 20 | 36,916.95 | 36 | 59,260.00 |
| 3rd | 1965 | 16 | 27,729.85 | 43 | 67,145.00 |
| 4th | 1965 | 22 | 38,998.45 | 5 | 7,000.00 |
| 1st | 1966 | 0 | 0 | 9 | 14,475.00 |
| TOTAL | | 69 | $126,315.70 | 287 | $476,935.00 |

8. (a) In the early 1960's, Mr. Hamrick was advised by a local Internal Revenue Agent that he should use 75 percent of his actual sale price as the base on which to compute his manufacturer's excise tax liability on sales of imported Volkswagens.

(b) During part of the period involved in the present litigation, Mr. Hamrick continued to use the formula referred to in paragraph (a) of this finding, both with respect to the sale of Volkswagens at retail to consumers and the sale of Volkswagens at wholesale to retailers.

9. During the quarters in issue, Mr. Hamrick's main competitor was VW of A, and his principal grey market competitor was a company known as Jattke & Capels. All three imported and sold identical models of Volkswagens.

10. (a) Jattke & Capels was a grey market importer of Volkswagens into the United States from Europe and a competitor of Mr. Hamrick.

(b) Sometime prior to April 29, 1965, Ray Culbertson, Jr., representing Jattke & Capels, orally requested that Roland L. Wolfe, a representative of the U.S. Internal Revenue Service stationed in London, England, furnish to him information as to the price of Volkswagens shipped to the United States on which the manufacturer's excise tax should be computed.

(c) On April 29, 1965, Mr. Wolfe responded in writing to Mr. Culbertson's inquiry, and stated in part as follows:

* * * [I]t seems that the price of the automobile plus Americanization should be considered the sales price for the purpose of the excise tax and the excise tax should not be computed on the delivery, forwarding fee, insurance, finance charges and freight. There is a requirement, however, that when the amount billed separately as freight is in excess of the actual transportation charge only the amount billed as freight in excess of the actual charge is taxable as part of the sales price.

I hope that the above will enable you to compute the proper excise tax on shipments requiring the imposition of such tax.

(d) At all times material to this litigation, the manufacturer's excise tax which Jattke & Capels paid on the Volkswagens which that company purchased in Europe and imported into the United States was based upon the purchase price of the vehicles in Europe, plus the cost of Americanizing the vehicles.

(e) The Volkswagens which Jattke & Capels purchased in Europe and imported into the United States were sold by that company at wholesale to retailers.

11. (a) In the spring of 1965, Mr. Hamrick obtained a copy of the letter referred to in finding 10(c).

(b) Beginning in about June 1965, and in reliance on the letter of April 29, 1965, to Ray Culbertson, Jr., Mr. Hamrick began filing his MET returns, and calculating his excise tax liability, on the basis of the cost of purchasing the Volkswagens in Europe, plus the cost of Americanizing the automobiles.

12. After the close of each quarter, Mr. Hamrick prepared his MET return by calculating the aggregate tax base (using the 75-percent-of-sale-price formula prior to June 1965 and the Jattke & Capels formula beginning in June 1965), and by assuming

that the total included the 10 percent (later 7 percent) manufacturer's excise tax. Mr. Hamrick then divided tax base by 110 (or 107), and multiplied the result by 10 (or 7). The results of these calculations were entered on the quarterly MET returns, which were prepared after the respective quarters were over.

13. (a) In 1968, the Internal Revenue Service examined Mr. Hamrick's MET returns for the period October 1, 1964–March 31, 1966, and determined that Mr. Hamrick owed $12,465 of additional MET.

(b) This deficiency was calculated by using as a tax base the actual sale price for those Volkswagens sold by Mr. Hamrick at wholesale to retailers, and, for those Volkswagens sold at retail to consumers, the average sale price for comparable automobiles sold by Mr. Hamrick to retailers.

(c) The Internal Revenue Service refused to permit Mr. Hamrick to utilize either the 75-percent-of-sale-price formula or the Jattke & Capels formula.

14. (a) In this suit, Mr. Hamrick is seeking refunds of MET, plus statutory interest, and the Government has counterclaimed for the additional $12,465 of MET referred to in finding 13, plus interest in the amount of $4,926.82.

(b) Mr. Hamrick's claims for refund are based upon contentions that (1) in calculating his MET liability, Mr. Hamrick should be permitted to utilize (without regard to his actual sale prices of the Volkswagens) the same tax base which his main competitor, VW of A, used, or the same tax base which his principal grey market competitor, Jattke & Capels, used, in computing the manufacturer's excise tax liability on the sale of imported Volkswagens identical with those sold by Mr. Hamrick, and (2) the excise taxes which are claimed by Mr. Hamrick were not passed on to customers but, rather, were absorbed by Mr. Hamrick.

(c) At the times material to this litigation, the MET of VW of A was computed on the basis of the actual sale price of imported Volkswagens by VW of A to regional distributors.

(d) The tax base used by Jattke & Capels at the times material to this litigation is indicated in finding 10.

15. (a) There follows a table which reflects (1) the amount of Mr. Hamrick's MET as reported and paid, (2) the amount of additional MET which the Government contends that Mr. Hamrick owes, and (3) the amounts of refunds that Mr. Hamrick has demanded in his claims for refund:

| Taxable Quarter | | MET Reported and Paid | Govt't's Claim For Add'l MET | Hamrick's Claim For Refund of MET |
|---|---|---|---|---|
| 4th | 1964 | $10,673.52 | $ 5,972.71 | $ 2,891.64 |
| 1st | 1965 | 10,766.10 | 2,495.16 | 4,366.10 |
| 2d | 1965 | 6,023.64 | 1,704.07 | 2,297.58 |
| 3rd | 1965 | 4,773.10 | 1,317.08 | 1,632.92 |
| 4th | 1965 | 2,016.09 | 381.36 | 550.67 |
| 1st | 1966 | 224.01 | 595.33 | — |
| TOTAL | | $34,476.46 | $12,465.71 | $11,738.91 |

(b) The defendant's claim for assessed interest is summarized in the following table:

| Taxable Quarter | | Government's Claim for Assessed Interest |
|---|---|---|
| 4th | 1964 | $2,463.53 |
| 1st | 1965 | 992.15 |
| 2nd | 1965 | 651.75 |
| 3rd | 1965 | 483.98 |
| 4th | 1965 | 134.41 |
| 1st | 1966 | 201.00 |
| TOTAL | | $4,926.82 |

16. (a) At all material times, the sale price of the Volkswagens sold by Mr. Hamrick were set to meet the price charged by competitors, principally VW of A and Jattke & Capels.

(b) The sale price of Mr. Hamrick's Volkswagens was determined and fixed as the result of negotiations by the plaintiff and the purchasers. In negotiating for the sale of a particular automobile or group of automobiles, Mr. Hamrick would quote a price to a customer, and the customer would then usually make a counter offer. The counter offer would often set the final sale price.

(c) At no time in the history of Mr. Hamrick's business was there a case where the sale price of the Volkswagens was first negotiated and an excise tax was then added.

17. (a) Mr. Hamrick's invoices made no reference to the manufacturer's excise tax. Rather, the invoices simply reflected the

sale price of the automobile or automobiles involved in the various transactions.

(b) In no situation was the manufacturer's excise tax separately stated or added to the sale price of an automobile or group of automobiles.

18. Plaintiff knew that there was an excise tax imposed with respect to each automobile which he imported, the tax to be imposed upon his sale of such automobile. Plaintiff did not know the amount of the tax, however, until the sale had been negotiated.

19. (a) Mr. Hamrick did not view the MET which he paid as a separate add-on item to be collected from the purchaser, but, rather, viewed it as part of his overall cost and expense of operation.

(b) To the extent possible, Mr. Hamrick endeavored to sell his imported Volkswagens at prices that would cover all costs and expenses, including the manufacturer's excise tax.

20. (a) Mr. Hamrick filed timely claims for refund of the taxes involved in this suit, and later timely filed this suit for refund.

(b) The Government's counterclaim was filed with the responsive pleadings.

21. The following table sets forth the number of Volkswagens imported by Mr. Hamrick during the quarter-years involved in the case, the MET proposed by the Internal Revenue Service on those particular Volkswagens (under the IRS theory that the tax is based on the sale prices received by Mr. Hamrick).

| Quarter | | Number of Volkswagens Imported and Sold by Hamrick | Met on Cars Sold by Hamrick Imposed by the IRS, $12,465 of which has not been paid |
|---|---|---|---|
| 4th | 1964 | 116 | $16,646.23 |
| 1st | 1965 | 89 | 13,261.26 |
| 2d | 1965 | 56 | 7,727.71 |
| 3rd | 1965 | 59 | 6,090.19 |
| 4th | 1965 | 27 | 2,397.45 |
| 1st | 1966 | 9 | 819.34 |
| TOTAL | | | $46,942.18 |

22. (a) Fiscal data with respect to Mr. Hamrick's operations are as follows:

| Year | Sales | Cost of Goods Sold | Gross Profit | Operating Expense | Net Profit |
|---|---|---|---|---|---|
| 1964 | $1,500,347 | $1,416,288 | $ 84,059 | $ 83,566 | $ 493 |
| 1965 | 1,250,483 | 1,114,664 | 135,819 | 134,672 | 1,147 |
| 1966 | 721,528 | 699,571 | 21,957 | 20,568 | 1,389 |

(b) The foregoing data include both the SAAB and Volkswagen sales and costs.

## CONCLUSION OF LAW

Upon the foregoing opinion and findings, the court concludes as a matter of law that the plaintiff is not entitled to recover, and it is therefore ordered that the petition shall be dismissed upon the conclusion of the proceedings relative to the defendant's counterclaim. The court further concludes as a matter of law, upon the foregoing opinion and findings, that the defendant is entitled to recover on its counterclaim, together with interest as provided by law, and judgment is entered to that effect. The case is remanded to the Trial Division for a determination of the amount of the defendant's recovery in accordance with Rule 131(c).