**BROWNING ARMS COMPANY, a Utah Corporation, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 97–252T.**

United States Court of Federal Claims.

April 7, 2003.

**124**

Andrew H. Stone, Jones, Waldo, Holbrook and McDonough, Salt Lake City, Utah, for plaintiff.

Benjamin C. King, Jr., Trial Attorney, Mildred L. Seidman, Director, United States Department of Justice, Tax Division, Washington, D.C., for defendant.

## OPINION

HORN, Judge.

The plaintiff, Browning Arms Company (Browning Arms), filed a complaint in this court for the recovery of "erroneously or illegally assessed and collected" excise taxes from the defendant. The plaintiff claims that from 1991 through 1993, Browning Arms paid excise taxes on firearms it sold, but mistakenly included the sale of exempt parts and accessories associated with the firearms in the calculation of the excise taxes paid to the government. According to the plaintiff's complaint, the Regional Director of the United States Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms, denied the plaintiff's claim for the excise tax refund related to allegedly exempt parts and accessories. The plaintiff subsequently filed suit in this court and presently asserts that "Browning Arms seeks to challenge defendant's determination that it is not entitled to any refund, as well as defendant's determination that certain of the parts and accessories for which the refund was claimed were not exempt from excise taxes under 27 C.F.R. § 53.61(b)." A trial was held in Salt Lake City, Utah. The parties have stipulated that Browning Arms' excise tax refund claim for allegedly exempt parts and accessories in this case totals $2,896,354.00.

## FINDINGS OF FACT

Browning Arms is a Utah Corporation with its principal place of business in Morgan, Utah. Don W. Gobel, the President and Chief Executive Officer of Browning, the parent company of Browning Arms, for the relevant dates, testified that Browning Arms "develops new firearms and sources and purchases and imports" firearms from domestic and foreign manufactures. The parent corporation, Browning, is responsible for the sale, marketing, and distribution of all Browning products. Browning purchases 100% of the firearms from Browning Arms in non-arms length transactions, and calculated its federal excise taxes using a constructive sales price based on Internal Revenue Service Revenue Ruling 62–68, 1962–1 C.B. 216, 1962 WL 13571 (1962). Under this constructive sales price approach, the basis for the sales price of each firearm from Browning Arms to Browning was ninety-five percent of the lowest sales price at which Browning sold the firearm to its wholesale distributors. In accordance with Revenue Ruling 62–68, the plaintiff's calculation of the excise tax due on a particular firearm followed several steps.

Robert Walker was employed as the Manager of Tax, Audit and Control for Browning from 1991 through 1993, and at the time of the testimony was the Browning Controller. According to Mr. Walker, Browning Arms would determine Browning's published wholesale price, for example, on a long gun, and multiply the wholesale price by ninety-five percent, to arrive at the constructive sales price. Browning Arms would then "back the excise tax out of that constructive sales price by dividing the constructive sales price in the case of long guns by 1.11. The reason it's 1.11 is because 11 percent of the excise tax rate on long guns." The result of this calculation was "the taxable price of the gun." To get the federal excise tax, Mr. Walker testified, Browning Arms would multiply the taxable price "by .11. By 11 percent."

**125**

At trial, Browning's former President and Chief Executive Officer, Don W. Gobel, testified regarding the process by which Browning established its prices for sales to its wholesale distributors, retailers, and dealers. According to Mr. Gobel, Browning's sales year would either begin on November 1 or December 1 of a given year and Browning would hold a sales meeting with its sales representatives regarding the upcoming year's prices for firearms. Prior to the annual sales meeting, Mr. Gobel testified that Browning would determine the prices of the firearms for the following year, to be used by the Browning sales representatives who would present the firearms, prices, terms, and conditions to Browning's wholesalers, retailers and dealers. Mr. Gobel stated that he had the responsibility to make the ultimate decision for the determination of the sales price at which Browning would market a particular firearm.

According to Mr. Gobel, the determination of sales prices for Browning firearms was based on a worksheet prepared by the marketing division within Browning that would provide the competitive prices for each model of the manufacturers in direct competition with Browning. Mr. Gobel explained that given the "highly competitive" market in the firearm industry, Browning relied on the market conditions of Browning's competitors when determining its own prices. Mr. Gobel further testified regarding Browning's market competition in the firearm industry: "We have a number of competitors all over the world. The market is a declining market since we have been under severe attack with new gun legislation and anti-hunting groups and, therefore, the market has become more and more competitive."

In addition to the competitive nature of the firearms industry in which Browning participated, Mr. Gobel explained that setting prices for Browning firearms also depended on the market strength of Browning's individual firearms. For example, according to Mr. Gobel, Browning enjoyed a competitive advantage over its direct competitors for "over and under shotguns" and would price them aggressively, whereas for other product lines Browning had "a very weak position

and pricing gets much more sensitive and we cannot take as high a price as we would like." Mr. Gobel's testimony reflected the price competition between Browning firearms and its competitors, as reflected in the worksheets prepared by the Browning marketing division, copies of which are in the record submitted to the court.

Mr. Gobel further testified regarding Browning's cost associated with the firearms and how they impacted his pricing decisions:

When I was setting prices on each model I essentially ignored the costs because we [Browning] are pricing to a very competitive market and, as evidenced by the variety of margins that we have on our products, ranging from I believe it was 7 percent to close to 40 percent it's obvious that I was not looking at costs.

In addition, Mr. Gobel testified that the costs associated with the excise taxes applied to the accessories and parts claimed to be exempt by the plaintiff would not have had an impact on his pricing decisions for Browning firearms. Mr. Gobel also testified that following the plaintiff's realization that the firearm accessories Browning had been paying excise taxes on during 1991 through 1993 were exempt, the change in the taxability of the firearms accessories did not affect his pricing determinations.

During Mr. Gobel's cross-examination, the defendant questioned Mr. Gobel regarding the inclusion of the excise tax on the firearm accessories and parts when he set the prices for Browning firearms:

Q. Okay. But you did indicate when you set your prices you wanted, Browning wanted to make a margin; correct?

A. Yes.

Q. And I take it that and [sic] you did define a margin as the wholesale price less discounts less direct costs; correct?

A. That is correct.

Q. And Browning's direct cost included the federal excise tax; correct?

A. Yes.

Q. So, therefore, when you looked at [sic] in terms—setting prices in terms of making a gross margin you wanted to set

the price sufficiently high enough to recover all of Browning's direct costs; correct?

A. That was certainly a goal because we're in business to make a profit. But as you can see by this very sheet that we had the A–500 [shotgun] and both A–500 models were making less than 10 percent margin because those products did not succeed in the marketplace as we anticipated and we could not price them so that they were profitable.

Q. But you were able to price them so that you could recover Browning's direct costs in those firearms; correct?

A. Browning's direct costs, yes.

Q. And you were able to price them so that Browning could recover all of its direct costs, including the federal excise tax; isn't that correct?

A. Yes.

On redirect, Mr. Gobel further explained the relationship between direct costs and the recovery of excise taxes on the firearm accessories and parts in the pricing of Browning firearms:

Q. Now, we talked earlier about administrative and sales costs. And you were asked about direct costs on a particular firearm. There're all costs that the company [Browning] has to pay, aren't they?

A. Yes, of course.

Q. And even if a firearm is sold at an amount that equals the direct costs, if it's not sold at more than that is the company making or losing money on that firearm?

A. With a 20 percent operating costs, obviously any product that we sell that does not make at least a 20 percent profit margin is a loss product. Yes, it makes, it covers the direct costs. But covering the direct costs doesn't mean anything. A company cannot stay in business if it only collects and covers its direct costs. Any company has an overhead structure to operate.

Q. And it's really just a matter of accounting to say that that money you got covers direct costs and not indirect costs. Couldn't you just as easily say it covered our indirect costs and not our direct costs?

A. Sure. All costs are costs. There're all money that we spend one way or another. In one case it's the direct cost of purchasing that product. And in the other case it's the operating functions of the business that make the business operate.

Q. So when you actually set out to identify your price on a given product for a given year to what extent were you driven by margins?

A. Well, I'm not going to say that I totally ignored it but as evidenced by this sheet that I'm looking at, on the A–500 [shotgun] we were losing money, but in spite of the fact that our margins were only just under 10 percent the market position of that product would not allow us to have a higher price and sell any of the product.

According to Richard Bauter, who at the relevant time period was the Browning Firearms Product Manager, and at the time of the testimony, was the Browning Vice President of Firearms, Browning charged a lower price for its firearms for tax exempt purchasers than non-tax exempt purchasers. The plaintiff's expert report also revealed that it was Browning's policy to arrive at the tax exempt purchase price by deducting the amount of the excise tax from the wholesale price.

The testimony at trial also revealed that Browning deducted the excise tax from Browning's wholesale price list for the calculation of foreign export sales. Mr. Bauter testified that he would take the wholesale price, deduct the federal excise tax from the wholesale price, and occasionally certain dealer discounts, to arrive at the export sale price. When explaining the calculation of export sales, Mr. Bauter agreed that excise taxes were "built into your prices for domestic sales but it's not built in, clearly its not built—its backed out of your pricing for export sales." Mr. Bauter also testified that Browning granted excise tax refunds and that, for instance, a domestic vendor could apply to Browning for a refund of the excise tax if the vendor subsequently sold the firearm in a foreign export sale.

The plaintiff offered the testimony of Gerald N. Keeler, a Strategy; Finance and Eco-

nomics Consulting Partner of Arthur Andersen, LLP. Mr. Keeler provided an expert report which examined whether the plaintiff had absorbed the excise taxes as it related to firearm accessories and parts or whether the plaintiff had passed the excise taxes on to the purchasers of the firearms. Following Mr. Keeler's review and adoption of a previously prepared Arthur Andersen expert report prepared for the litigation in this case, an examination of supporting documentation for the report, a review of the depositions, several personal interviews, and a review of the government's position in this case, Mr. Keeler's additions to the report and testimony offered at trial concluded that "Browning did absorb the excise taxes that related to the accessories on the firearms and did not pass that through to the ultimate purchasers."

Mr. Keeler determined that during 1991 through 1993, Browning established its product prices based on the competitive market for firearms. Mr. Keeler determined that Browning was a market-based pricer for its firearms because in establishing prices, Browning management considered various factors, including, competitor prices, volume of sales for a particular firearm sold in past years, market image for the product in question, estimated demand for the upcoming year, strength or softness of the market, and any impending gun legislation. Mr. Keeler's conclusion that Browning was a market-based pricer was supported by his observation that "[a]lthough Browning could adjust its product prices after completing this [cost] analysis, generally the market price was set *before* Browning knew what the final product costs would ultimately be." (Emphasis in original).

In forming his opinion that competitors in the firearms market did not pay excise taxes for parts and accessories, Mr. Keeler relied on an industry survey, conducted by the Sporting Arms and Ammunition Manufacturers' Association (SAAMI), and on an informal survey conducted by Arthur Andersen as part of the preparation for the litigation at issue. Mr. Keeler presented the results of the two surveys to support his theory that the firearms market that Browning used to set its prices did not include excise taxes on

parts and accessories. Mr. Keeler, relying on the surveys, testified that "at least some" of Browning's competitors were not paying excise taxes on parts and accessories.

The SAAMI survey, conducted in 1988, was sent to twenty-eight firearms companies and anonymous responses were received from nineteen companies. The results of the SAAMI survey, relied upon by Mr. Keeler's report, show that a majority of the responses did not indicate whether or not they had paid excise taxes for parts and accessories. Of the responses that did indicate whether they had paid excise taxes, a majority of the manufacturers reported that they had paid excise tax on parts and accessories, while a minority indicated that they had not paid the excise tax on parts and accessories. For example, for the over and under shotgun, eighteen responses were received, thirteen responses did not indicate whether they had paid the excise tax on invector choke tubes, four responses indicated that they had paid the excise tax on the invector choke tube, and one response indicated that it had not paid the excise tax on the invector choke tube. For the centerfire semi-automatic rifle, eighteen responses were received. Thirteen responders did not indicate whether the manufacturers had paid an excise tax on "recoil pad/butt plate," four responders indicated that they had paid the tax, and one responder indicated that it had not paid the excise tax on the "recoil pad/butt plate." The survey results for the other firearms indicated similar responses from firearms manufacturers.

Mr. Keeler was questioned regarding the scope of the SAAMI survey during cross-examination. Mr. Keeler testified that the survey was sent out to members and non-members of SAAMI, but he could not testify as to whether the responses received by SAAMI represented firearms manufacturers that were in competition with Browning. In fact, Mr. Keeler was unable to identify the specific manufacturers who responded to the survey since the responses were received anonymously. Mr. Keeler also testified that the manufacturers questioned were not asked whether they included the excise tax on parts and accessories in the price of the

firearm, but only whether the manufacturer had paid an excise tax on the specified part or accessory. Furthermore, Mr. Keeler testified that the SAAMI survey "did not inquire or contain any information about any of those competitors' pricing practices."

Mr. Keeler's testimony also identified a second survey used in his analysis, which was conducted by Arthur Andersen. The survey received two response, from the Remington Arms and the Savage Arms firearm companies. The results of the Arthur Andersen survey indicated that, in general, Remington Arms had paid excise taxes on parts and accessories and Savage Arms had not paid the excise taxes. Prior to Mr. Keeler's testimony, Mr. Gobel was questioned regarding whether Savage Arms was a competitor of Browning, and he stated that "Savage [Arms] was a factor in bolt action rifles. And they did have a few models that would, their highest priced models might come close to our lowest priced models. But we did not consider Savage in the same category as Browning."

Mr. Keeler's testimony and report also identified a number of other factors offered to support his conclusion that Browning did not pass-on the excise tax on accessories and parts of the firearms to the ultimate consumer. Mr. Keeler found the following factors relevant to his determination: 1) no correlation existed between price changes and excise tax application to the firearm's accessories and parts; 2) the firearms market recognizes the difference between taxable and tax exempt sales of firearms, trade discounts and similar factors; 3) there was no reference to excise taxes on Browning invoices to customers or sales literature; 4) negotiated contracts between Browning and its customers make no reference to excise taxes; 5) although there is an accounting of the excise tax by Browning Arms, and Browning records the excise tax as a cost, these considerations do not indicate that Browning passed-on the excise tax; and 6) the company's profitability does not indicate that it passed the excise tax onto its customers or that Browning used cost based pricing.

### Firearm Accessories and Parts

The plaintiff's complaint alleges that Browning Arms erroneously paid excise taxes on parts and accessories sold with thirty-nine firearms in 1991 through 1993. The firearms include sixteen shotguns,[1] seventeen rifles [2] and six pistols.[3] The plaintiff's complaint provides a list of the parts and accessories sold with the individual firearms, and the parties have stipulated to the identification of the individual parts and accessories. The parties have further separated and identified two groups within the parts and accessories; the parts and accessories that the parties agree are exempt from the excise tax and those parts and accessories the parties disagree are exempt from the excise tax. The parties have stipulated that the parts and accessories that are exempt from the excise tax were included in the price from which Browning Arms calculated its total excise tax for 1991 through 1993, and represents $1,162,355.00 of the plaintiff's claim. The parties, however, disagree as to whether Browning Arms passed on the excise tax paid on the tax exempt parts and accessories to the ultimate purchasers of the firearms.

The remaining $1,733,999.00 of plaintiff's claim represents parts or accessories on which the parties disagree as to their exempt status. The government argues that the parts and accessories discussed below are not exempt from the excise tax. The defendant

---

1. The sixteen shotguns at issue include the A–500G shotgun, A–500R shotgun, Auto–5 shotgun, BPS 10, 12 and 20 gauge shotguns, BT–99 shotgun, BT–99 Plus shotgun, Citori shotgun, Model 12 (12 and 20 gauge) shotguns, Model 42 shotgun (410 bore), Superposed shotgun, B–80 shotgun, BSA 10 gauge shotgun, and the Recoilless Trap.

2. The seventeen rifles include the 1885 rifle with sights, BAR rifle with and without sights, A–Bolt rifle with and without sights, Model 81 BLR short action rifle with sights, Model 81 BLR long rifle action with sights, Model 1886 carbine, 22 semi-automatic rifle, A–Bolt 22 rifle with and without sights, BL–22 rifle, Model 52 rifle, Model 65 and 53 rifles, BAR rifle with BOSS system, and the A–Bolt rifle with BOSS system.

3. The six pistols included the 9 millimeter Hi Power pistol, BDA 380 pistol, Buck Mark Standard pistol, Buck Mark Standard pistol—5.5 series, Buck Mark Silhouette pistol, and the 40 Smith and Wesson HP pistol.

also asserts, although the plaintiff disagrees, that even if the disputed parts and accessories were not subject to the excise taxes from 1991 through 1993, Browning Arms passed the excise tax paid on the parts and accessories to the ultimate purchasers of the firearms.

The parts and accessories sold with the firearms at issue on which the parties do not agree as to whether or not the parts and accessories are exempt from the excise tax include the following: invector choke tubes, or parts whose only function is associated with the invector choke tube's function; magazines, or parts whose only function is associated with the magazine's function; butt plates or recoil pads, or parts whose only function is associated with the butt plate's or recoil pad's function; pistol grips, or parts whose only function is associated with the pistol grip's function; trigger guards, or parts whose only function is associated with the trigger guard's function; and other miscellaneous parts discussed below. The parties provided a number of witnesses to provide technical information, including Larry Nelson, the Chief Engineer for Browning, and Curtis Bartlett, Chief of the Firearms Technology Branch at the Bureau of Alcohol, Tobacco, and Firearms.[4]

### Invector Choke Tube

The parties have stipulated that, when multiple invector choke tubes are supplied with a gun, or when invector choke tubes are sold separate from a gun, all such invector choke tubes, and the tool for interchanging them, except the first one sold with the gun,

constitute accessories exempt from excise tax. During the period from 1991 through 1993, the plaintiff sold eleven types of shotguns with invector choke tubes that plaintiff claims were exempt from the excise tax.[5]

Invector choke tubes are inserted into the barrel of a shotgun for the purpose of altering the density of the pattern of the pellets that are discharged as the shotgun is fired. The purpose for which the shotgun is used generally dictates the type of invector choke tube a user will choose. According to the testimony at trial, Browning sold the shotguns at issue during 1991 through 1993 with a warning label that advised the purchaser not to fire the firearm without the invector choke tune installed in the barrel. Testimony on behalf of Browning Arms, however, explained that the warning initially was to prevent the owner of the firearm from damaging the threads in the barrel that secured the invector choke tube, but Browning discovered that the threads would not be damaged and eventually ceased putting the warning labels on the shotguns in subsequent years. The plaintiff's and the defendant's witnesses testified that the invector choke tubes could easily be removed from the shotguns, that the shotguns could be fired without the invector choke tubes, but, ultimately, the design of the shotguns was to accommodate the invector choke tubes.

### Magazines

For the firearms at issue in this case, the plaintiff sold approximately thirty-one firearms that came equipped with one or more magazines.[6] A magazine holds multiple

---

4. During the review of the exhibits submitted as part of the record, the court became concerned that further clarification of the parts and accessories alleged by the plaintiff to be exempt might be helpful. Therefore, by order dated December 30, 2002, the court directed the parties to submit a joint status report proposing possible ways in which to further identify and clarify the alleged accessories and parts. After further review and given the basis of the court's decision, however, the court does not require further clarification on these issues.

5. The firearms that were sold with invector choke tubes were the A–500G shotgun, A–500R shotgun, Auto–5 shotgun, BPS 10, 12, and 20 gauge shotguns, BT–99 shotgun, BT–99 Plus shotgun, Citori shotgun, BSA 10 gauge shotgun, and the Recoilless Trap.

6. The firearms that were sold with magazines were the A–500G shotgun, A–500R shotgun, Auto–5 shotgun, BPS 10, 12 and 20 gauge shotguns, Model 12/42 (12 and 20 gauge) shotguns, B–80 shotgun, BSA 10 gauge shotgun, BAR rifle with and without sights, A–Bolt rifle with and without sights, Model 81 BLR short action rifle with sights, Model 81 BLR long rifle action with sights, Model 1886 carbine, 22 semi-automatic rifle, A–Bolt 22 rifle with and without sights, BL–22 rifle, Model 52 rifle, BAR rifle with BOSS system, A–Bolt rifle with BOSS system, A–Bolt 22 rifle with the BOSS system, 9 millimeter Hi Power pistol, BDA 380 pistol, Buck Mark Standard pistol, Buck Mark Standard pistol—5.5 series, Buck Mark Silhouette pistol, and the 40 Smith and Wesson HP pistol.

shells for firing the gun multiple times without stopping to manually insert another shell. Generally a magazine consists of either a tube under the barrel of the firearm or a cartridge that is attached to the firearm that may house a latching device, magazine follower, magazine cap retainer, magazine spring retainer, and a spring. The various guns sold by the plaintiff which were sold with magazines function in a similar manner, but have various parts that aid in the function of the magazines. All of the firearms that were sold with a magazine are able to fire without the magazine attached, although with some models it is more difficult. For example, several of the shotguns have a magazine cutoff switch and the magazines are removable from the shotguns that are at issue with slight modifications. The majority of rifles that were sold between 1991 through 1993 also included magazines. The magazines are removable and able to fire without the magazine attached. The pistols sold by the plaintiff from 1991 through 1993 also included magazines. The pistols require the removal of a magazine safety, an internal mechanism which prevents the pistols from firing without the magazine in place.

### Recoil Pads and Butt Plates

The rifles and shotguns sold during 1991 through 1993 were sold with either butt plates or recoil pads, and accompanying fasteners such as screws and washers, which the plaintiff claims are accessories and parts exempt from taxation. The butt plate generally has a face that covers the end of the firearm stock and has contours on the outside surface. The contours on the butt plate aid the shooter in bringing the stock to the shoulder for firing the firearm. A recoil pad also covers the end of the firearm stock, and is similarly used to shoulder the firearm. The difference between the butt plate and the recoil pad is the recoil pad's function to reduce the recoil of the firearm as it is discharged. The butt plates and recoil pads are removable and the firearms can be fired without them.

### Trigger Guards

Three of the shotguns at issue have trigger guards that the plaintiff claims are exempt from excise taxes.[7] Trigger guards serve primarily as a safety feature which prevents the trigger from being unintentionally hit causing the firearm to be discharged. As described at trial, the trigger guard can be removed from the firearm by removing a screw that sets the tab of the trigger guard, and once the screw is removed, the guard may either be rotated ninety degrees and pulled-out or the removal of an additional screw is required before removal. The firearms are capable of being fired when the trigger guard is removed.

### Pistol Grips

The pistols that were sold by the plaintiff during the 1991 through 1993 period and at issue in this litigation, were sold with removable pistol grips. The pistol grips are attached to either side of the metal frame of the pistol and provide a surface for gripping the firearm. The testimony at trial revealed that the pistols could be fired without the pistol grips attached.

### Miscellaneous Parts

The plaintiff claims that the excise tax should not be applied to a range of miscellaneous parts which were sold with various firearms. The first group of miscellaneous parts included stock screw locks, stock bolt washers, and stock spacer plates. The stock screw locks, stock bolt washers, and stock spacer plates are used to secure the stock of the firearm to the receiver. The stock screw locks, stock bolt washers, and stock spacer plates are removable from the firearms and the firearms are capable of being fired without the parts. The stock screw locks, stock bolt washers, and stock spacer plate are claimed exempt by Browning Arms on the A–500G shotgun, A–500R shotgun, BPS 10,[8] 12, and 20 gauge shotguns, BT–99 shotgun, Citori shotgun, 1885 rifle with sights, Model 81 BLR short action rifle with sights, Model

---

7. The firearms that were sold with trigger guards were the BT–99 shotgun, BT–99 Plus shotgun, and the Citori shotgun.

8. The BPS 10 gauge shotgun and the BSA 10 gauge semi-automatic shotgun were the only two firearms for which the plaintiff claimed the stock spacer plate as a miscellaneous part exempt from excise taxation.

81 BLR long action rifle with sights, BL–22 rifle, Superposed shotgun, and the BSA 10 gauge semi-automatic shotgun.

The second group of miscellaneous parts included the friction ring assembly on the Auto–5 shotgun. The friction ring assembly increases or decreases the velocity of the barrel of the shotgun during recoil as the gun is fired. The type of shell that is being fired from the Auto–5 shotgun dictates the setting of the friction ring assembly. The effect of the friction ring assembly is to reduce the recoil of the shotgun. The Auto–5 shotgun's friction ring assembly can be removed with simple tools and can be fired without the assembly in place.

The BT–99 Plus shotgun was sold with a series of miscellaneous parts constituting a spring mounting device attached to the rear of the firearm, and coupled with recoil pads, that produced a system for the reduction of recoil. In addition to reducing recoil, the spring mounting device also aided in fitting the firearm to the shoulder of the user. According to the testimony at trial, the spring mounting device and its associated parts added to the comfort of the firearm and reduced recoil.

The BT–99 Plus shotgun and the Citori shotgun were sold with miscellaneous parts that allowed the user to adjust the forearm. The parts at issue, which included a forearm screw and forearm screw escutcheon, could be removed by the use of tools and the firearms could be fired without the parts attached.

The BL–22 rifle was sold with a muzzle clamp and muzzle clamp screw. These miscellaneous parts attach the cylindrical tube magazine to the underside of the barrel of the rifle.

The Model 65/53 rifles sold by Browning Arms included two sets of miscellaneous parts, forearm tips screws with associated parts, and loading gate covers. The only difference between the Model 65 rifle and Model 53 rifle is the caliber. The forearm tip screws, with the associated parts, mount the forearm to the receiver, can be removed by simple tools, and the firearm can be fired without the screws in place. The loading gate cover functions to allow the user to load shells into the magazine, can be removed with simple tools, and the rifles can be fired without the part.

BSA 10 gauge shotgun was sold with a forearm shoe and forearm shoe set. According to the testimony at trial, these parts were an "alignment device."

The Benchmark Standard, Benchmark Series 5.5, and the Benchmark Silhouette pistols were sold with miscellaneous sight base parts. The testimony at trial revealed that although the miscellaneous sight base parts can be removed, and the pistols can be fired, the pistols can come apart in the process of firing.

The B–80 shotgun was sold with miscellaneous stock retaining plates and stock nuts for the mounting of the stock to the receiver of the shotgun. The stock retaining plates and stock nuts can be removed from the firearm, do not prevent the firearm from being fired, and will not cause the stock of the firearm from being separated from the receiver.

The final miscellaneous part claimed by Browning Arms is the rib insert sold with the Recoilless Trap, a shotgun used in trap shooting. The rib insert is a sighting plane that allows for mounting the beads for sighting the firearm. The rib insert can be removed by the use of simple tools and the shotgun can be fired without the miscellaneous part attached.

## DISCUSSION

Throughout 1991 to 1993 Browning Arms sold its firearms to Browning, Browning Arm's parent company. The plaintiff brought this suit for the refund of excise taxes the plaintiff claims were erroneously paid on the sale of firearms to Browning for the years 1991 through 1993. The plaintiff alleges that parts and accessories sold with the firearms were tax exempt pursuant to 27 C.F.R. § 53.61(b), and, therefore, the plaintiff seeks a refund of excise taxes paid on those exempt parts and accessories.

Section 4181 of the Internal Revenue Code provides:

There is hereby imposed upon the sale by the manufacturer, producer, or importer of the following articles a tax equivalent to the specified percent of the price for which so sold:

Articles taxable at 10 percent—

Pistols.

Revolvers.

Articles taxable at 11 percent—

Firearms (other than pistols and revolvers).

26 U.S.C. § 4181 (1988). The Code of Federal Regulations (CFR) defines the term pistols for the purposes of the tax imposed by section 4181, as follows:

The term "pistols" means small projectile firearms which have a short one-hand stock or butt at an angle to the line of bore and a short barrel or barrels, and which are designed, made, and intended to be aimed and fired from one hand. The term does not include gadget devices, guns altered or converted to resemble pistols, or small portable guns erroneously referred to as pistols, as, for example, Nazi belt buckle pistols, glove pistols, or one-hand stock guns firing fixed shotguns or fixed rifle ammunition.

26 C.F.R. § 48.4181–2(a) (1991). The CFR defines firearms for the purposes of the tax imposed by section 4181, as follows:

The term "firearms" means any portable weapons, such as rifles, carbines, machine guns, shotguns, or fowling pieces, from which a shot, bullet, or other projectile may be discharged by an explosive.

*Id.* at § 48.4181–2(c).

Because the plaintiff, Browning Arms, sold one hundred percent of its firearms to its parent company, Browning, the plaintiff calculated its sale price for the determination of the excise tax provided for in section 4181 in accordance with 26 U.S.C. § 4216(b)(1)(C) and Revenue Ruling 62–68, 1962 WL 13571 (1962). Section 4216(b)(1)(C) establishes guidelines for the determination of constructive sales prices when goods are "sold (otherwise than through an arm's length transaction) at less than the fair market price." 26 U.S.C. § 4216(b)(1)(C). The Internal Revenue Service (IRS) issued Revenue Ruling 62–68 to provide advice for the "method of computing the manufacturers excise tax under section 4216(b)(1)(C) of the Internal Revenue Code of 1954, where an article is sold otherwise than through an arm's length transaction at less than the fair market price." Rev. Rul. 62–68, 1962–1 C.B. 216. The IRS's Revenue Ruling 62–68 explained the method for computing the manufactures excise tax under section 4216(b)(1)(C), as follows:

It is the position of the Service that on intercompany sales at less than arm's length and less than the fair market price, a manufacturer of an article taxable under Chapter 32 of the Code (where tax is based on sale price) may elect to use as a basis for tax, pursuant to section 4216(b)(1)(C), a constructive sale price equal to 95 percent of its selling company's lowest established resale price for the article to unrelated wholesale distributors in the ordinary course of trade. This five percent margin is an allowance for those exclusions from, and readjustments of, the selling company's resale price which, under sections 4216 and 6416, the law would allow a manufacturer selling in the ordinary course of trade to unrelated distributors. Where the selling company's resale price includes the tax and the rate of tax applicable is 10 percent, for example, the tax may be computed at 1/11 (10/110) of the constructive sale price in order to exclude the amount of the tax from the tax base as provided by law.

Rev. Rul. 62–68, 1962–1 C.B. 216. The plaintiff elected to calculate its sales prices for the firearms sold to Browning based on the guidance of Revenue Ruling 62–68.

The plaintiff's claim for recovery of overpaid excise taxes is governed by 26 U.S.C. § 6416(a)(1). Section 6416(a)(1) imposes general requirements on all taxpayers claiming refunds of excise taxes, including the excise tax in § 4181. The pertinent portion of § 6416(a)(1) states:

(1) General rule

No credit or refund of any overpayment of tax imposed by chapter 31 (relating to retail excise taxes), or chapter 32 (manufacturers taxes), shall be allowed or made unless the person who paid the tax estab-

lishes, under regulations prescribed by the Secretary, that he—

(A) has not included the tax in the price of the article with respect to which it was imposed and has not collected the amount of the tax from the person who purchased such article;

(B) has repaid the amount of the tax to the ultimate purchaser of the article . . . .

26 U.S.C. § 6416(a)(1).

The United States Court of Appeals for the Tenth Circuit reviewed the history of 26 U.S.C. § 6416(a)(1) and the congressional intent behind the statute's enactment:

Section 424 of the Revenue Act of 1928 provided that no refund would be made of any tax paid by or collected from a manufacturer "in respect of the tax imposed by" various provisions of the tax laws unless certain conditions were met. If a simple overpayment was involved, the taxpayer had only to show that fact. In other instances, however, the taxpayer had to satisfy the Commissioner that the tax had not been passed on or, if passed on, that it had been returned. In the alternative, the taxpayer could post a bond guaranteeing the distribution of any refund to his customers. The reason underlying these restrictions was that the Committee on Ways and Means did "not believe that, as a general principle, the taxes paid upon such articles subsequently held to be not taxable should be refunded and thus unjustly enrich the manufacturers who merely collected the tax from the persons to whom they sold the articles." H. Rep. No. 2, 70th Cong., 1st Sess., p. 27 (1939–1 Cum. Bull. (Part 2) 384, 402). The constitutionality of 424 was upheld in *United States v. Jefferson Electric Manufacturing Co.*, 291 U.S. 386, 402, 54 S.Ct. 443, 78 L.Ed. 859 [(1934)].

The provisions of 424 were carried forward in 621(d) of the Revenue Act of 1932, which reads that no "overpayment of tax" shall be refunded without compliance with the stated conditions. With reference thereto, the House Report said that "no manufacturer or dealer should be permitted to recover an overpayment which in fact has been borne by the purchasers." H. Rep. No. 707, 72d Cong., 1st Sess., p. 39

(1939–1 Cum. Bull. (Part 2) 457, 485). The language of 621(d) was construed in *D. Gottlieb & Co. v. Harrison*, N.D. Ill., 27 F.Supp. 424, 426 [(1938)], to include not only overpayments but also payments of taxes erroneously or illegally assessed. In *Feitler v. Harrison*, 7 Cir., 126 F.2d 449, 450–451 [(1942)], refunds of erroneously collected taxes were disallowed because of noncompliance with 621(d). *See also Andrew Jergens Co. v. Conner*, 6 Cir., 125 F.2d 686 [(1942)].

With no material changes, 621(d) appeared in the Internal Revenue Code of 1939 as 3443(d). Courts construing this section have held that its intent was the prevention of unjust enrichment. *Worthington Pump & Machinery Corp. v. United States*, 122 F.Supp. 843, 846, 129 Ct.Cl. 87 [(1954)]; *Vogel v. Knox*, D. Minn. 147 F.Supp. 10, 13 [(1957)]. In *123 East Fifty–Fourth Street, Inc. v. United States*, 2 Cir., 157 F.2d 68 [(1946)], the court affirmed a judgment allowing recovery of erroneously paid cabaret taxes which had been passed on to customers. The court said that 3443(d) did not apply to the chapter imposing cabaret taxes.

Section 3443(d) was in turn replaced in the Internal Revenue Code of 1954 by 6416(a), with which we are concerned. The language was changed to forbid any refund "of any overpayment of tax imposed by" other provisions, which include manufacturers taxes, unless the stated conditions were satisfied. The legislative history recognizes the rule that a "refund will be made only if there is a showing that the tax has not been passed on." H. Rep. No. 1337, 83d Cong., 2d Sess., p. A413, 3 U.S. Cong. News '54 4017, 4560. The intent is "to insure that a taxpayer has not been unjustly enriched by passing the tax on to his customers and then receiving a refund from the government." *Air Lift Company v. United States*, W.D. Mich., 286 F.Supp. 249, 254 [(1968)], affirmed 6 Cir., 418 F.2d 558 [(1969)]. *Norris Dispensers, Inc. v. United States*, 8 Cir., 325 F.2d 140 [(1963)], applied 6416(a) to deny recovery of an erroneously collected tax that had been passed on to purchasers.

*Travel Indus. of Kan., Inc. v. United States,* 425 F.2d 1297, 1298–99 (10th Cir.1970).

In the case before this court, the plaintiff's complaint alleges that the sale of its firearms during the years 1991 through 1993 included excise taxes that were not passed on to its customers and states:

> The basis for the sales price of each firearm with parts and accessories from Browning Arms to Browning was the sales price at which Browning sold the firearms including parts and accessories to wholesale distributors. Each such price was set according to a market price, which did not include excise taxes on parts and accessories. Thus, Browning Arms and Browning did not include excise tax on parts and accessories when pricing the firearms to Browning's wholesale distributors and Browning and Browning Arms did not collect the amount of the tax from persons who purchased such articles.

The defendant has challenged the plaintiff's claim and argues that the testimony of the plaintiff's witnesses at trial established that the price of the firearms sold by Browning included the excise tax on parts and accessories, and, therefore, that the plaintiff is not entitled to a refund under 26 U.S.C. § 6416(a)(1).

Because the plaintiff, Browning Arms, chose to calculate a constructive sales price, for excise tax purposes, based on the market price established by Browning pursuant to 26 U.S.C. § 4216(b)(1)(C), the court must review Browning's sales pricing to determine whether Browning, and in turn, Browning Arms, bore the economic burden of the excise tax. Whether or not the plaintiff bore the economic burden of the excise tax is a factual question. *A.S. Epstein v. United States,* 174 Ct.Cl. 1158, 1174, 357 F.2d 928, 937 (1966). The United States Court of Claims offered guidance for courts attempting to determine whether a manufacturer bore the economic burden of a tax. *Worthington Pump & Mach. Corp. v. United States,* 129 Ct.Cl. 87, 93, 122 F.Supp. 843, 847 (1954). The *Worthington* court noted that the determination of whether the manufacturer bore the economic burden of the tax is difficult to determine because "under ordinary competitive conditions no tax can be passed on completely since a rise in price has the tendency of reducing the volume of business." *Id.* Secondly, the court observed that whether a manufacturer is making a profit or a loss does not in itself determine whether the tax was passed on to its customers. *Id.* "The only test is whether the seller has made a profit less than or sustained a loss greater than had the tax not been imposed on him." *Id.*

In *Tenneco, Inc. v. United States,* 17 Cl.Ct. 345 (1989), *aff'd* 899 F.2d 1227, 1990 WL 20805 (Fed.Cir.1990) (table), the United States Claims Court provided an analytical framework for the application of 26 U.S.C. § 6416(a)(1) in excise tax refund cases. The plaintiff in *Tenneco* claimed an excise tax refund on manufactured replacement motor parts and accessories. The court wrote: "Based on these facts, this court must determine whether plaintiff included federal excise taxes in the price of manufactured replacement parts for which it claims a refund. In other words, this court must decide whether plaintiff bore the burden of the excise taxes or shifted that burden to its customers." *Id.* at 348.

The *Tenneco* court's analysis first observed that the method a taxpayer uses to set the prices of its goods directly affects the type of proof necessary to establish that those prices did not include an excise tax component, as required under section 6416(a). *Id.* at 350. The court in *Tenneco* noted that a manufacturer may either set its prices based on the prevailing market prices for the goods sold, termed competitive pricing, or set its prices based on the production costs of the goods sold, plus a profit margin, termed cost based pricing. *Id.* If a court is confronted with a manufacturer who sets the prices of its goods based on costs, the court simply determines whether the manufacturer included the applicable excise tax as part of the final cost of the good. *Id.* Alternatively, if the manufacturer based its prices on the competitive market, a court must determine whether the market prices include an excise tax component. *Id.; see also Holmes Limestone Co. v. United States,* 946 F.Supp. 1310, 1314

(N.D.Ohio 1996), *aff'd* 1998 WL 773890 (6th Cir. Oct.15, 1998).

The evidence offered by the plaintiff at trial established that Browning set its prices based on its competitors in the firearms market. Browning's President and Chief Executive Officer, Mr. Gobel, testified that prior to Browning's annual sales meeting, Browning would determine the prices of the firearms for the following year based on a worksheet prepared by the marketing division within Browning which provided the market prices of Browning's competitors for comparable models of firearms. Mr. Gobel testified to the "highly competitive" market in the firearms industry and, that therefore, Browning was compelled to rely on market conditions when determining its own prices. The worksheets prepared by the marketing division at Browning and the testimony of Mr. Gobel provided specific examples of the market influence on the establishment of Browning's prices. First, Mr. Gobel explained that Browning enjoyed a competitive advantage over its competitors for some models of shotguns and was able to price them aggressively, while the pricing of other models of Browning shotguns was constrained by the highly competitive market. The worksheets prepared by the marketing division at Browning also reflected the effect the firearms market had on Browning's own pricing. The worksheets evidenced only minor fluctuations in prices for Browning firearms from year to year, which supports Mr. Gobel's testimony that the firearms market dictated the prices that Browning established for its firearms. The worksheets prepared by the marketing division at Browning listed the prices of the manufacturers with which Browning was in direct competition and not only showed that Browning's prices were somewhat static, but showed that the prices of Browning's direct competitors were so as well.

Given a finding that Browning set its prices based on the competitive market, the *Tenneco* court instructs that the taxpayer must "present evidence to answer the central question: Does the market price contain an excise tax component? This inquiry influences the ultimate question of whether the

taxpayer's prices included excise taxes." *Tenneco, Inc. v. United States,* 17 Cl.Ct. at 350. In addition to direct evidence of the components of the market prices, the *Tenneco* court identified a variety of factors that courts have weighed to answer the question of whether the market prices included an excise tax component. Some of the factors included are:

> (1) the correlation between price changes and application of the tax, (2) the refunding of tax to exempt purchasers, (3) the reference to taxes in invoices or sales literature, (4) the existence of negotiated contracts including excise taxes, (5) the correlation between prices for taxable domestic sales and exempt foreign sales, (6) the methods of accounting for the tax, and finally, (7) taxpayer profitability. Some of these factors have different weight and applicability depending on whether the taxpayer used cost-based or competitive [market] pricing.

*Id.* The *Tenneco* court stated that "[t]hese factors examine the taxpayer's actions for evidence of whether its prices contained an excise tax component." *Id.* It is important to note that the court also emphasized that these factors have different weight and applicability depending upon the factual circumstances of the case. *Id.*

### Excise Taxes in the Market Price

The first question the *Tenneco* court suggests a court should resolve is whether a manufacturer can show by direct evidence that the market it bases its prices on does not contain an excise tax component. *Id.* at 351. Although the court recognizes that the "burden of proving the components of a competitor's price may on some occasions prove difficult," *Tenneco, Inc. v. United States,* 17 Cl.Ct. at 350, the plaintiff is nonetheless obligated to come forth with competent evidence to show that the market did not contain an excise tax component. The evidence relied upon the plaintiff to prove that the firearms market that Browning used to set its prices did not contain an excise tax component included the results of two surveys and the testimony of its accountant expert, Mr. Keeler. Mr. Keeler testified, relying on material in the expert report, that "at least some" of

Browning's competitors were not paying excise taxes on parts and accessories. In forming his opinion that some competitors in the firearms market did not pay excise taxes for parts and accessories, Mr. Keeler relied on the SAAMI survey and the informal survey conducted by Arthur Andersen.

The difficulty with Mr. Keeler's reliance on the SAAMI survey was pointed out in direct examination. Mr. Keeler, much less the court, could not determine whether the responses received by SAAMI were from the market competitors listed in the worksheets prepared by the Browning marketing division that Mr. Gobel relied upon when setting the prices of Browning firearms. The survey received anonymous responses from nineteen companies and Mr. Keeler testified that he was unable to determine if the responders to the SAAMI survey were the direct competitors that Browning considered when setting its prices. Moreover, the SAAMI survey did not provide information as to whether the market competitors included or did not include the excise tax on parts and accessories in the prices of their firearms, but only whether the manufacturers had paid an excise tax on the specified part or accessory. Finally, the results of the SAAMI survey showed that a majority of the responses did not indicate whether they had paid excise taxes for parts and accessories at all, and those manufacturers that did respond, indicated that a majority of them had paid excise tax on parts and accessories, while, in general, a minority of responses had not paid the excise tax.

The second survey, conducted by Arthur Andersen, likewise provided little direct or persuasive evidence as to whether the firearms market of direct competitors relied on by Browning in setting its prices included excise taxes on parts and accessories in the setting of prices. The Arthur Andersen survey received two response from the Remington Arms and the Savage Arms firearm companies. The result of the Arthur Andersen survey indicated that Remington Arms had paid excise taxes on parts and accessories and that Savage Arms had not. Remington Arms was a direct competitor of Browning, as evidenced in the worksheets relied on by

Mr. Gobel when pricing Browning firearms. In contrast, Mr. Gobel testified that although Savage Arms may have had a few products similar to those sold by Browning, he "did not consider Savage in the same category as Browning."

Testimony offered by other Browning employees actually contradicted the testimony of Mr. Keeler. Mr. Bauter testified that Browning charged a lower price for its firearms for tax exempt purchasers than non-tax exempt purchasers. He also testified at trial regarding the treatment of export sales and stated that the excise taxes applied to firearms were "built in" to Browning's domestic sale prices and were subsequently "backed out" for the pricing of export sales.

Plaintiff, based on the SAAMI and the Arthur Andersen surveys, has failed to provide sufficient evidence that the firearms market that Browning relied upon in setting its prices did not contain an excise tax component. To the contrary, the SAAMI survey only provided evidence that a small minority of the firearm manufactures did not pay excise taxes on certain parts and accessories. On the whole, the SAAMI survey did not identify whether Browning's direct competitors paid or included excise taxes in its pricing of parts and accessories. The survey conducted by Arthur Andersen, the firm hired by Browning for the purposes of this litigation, offered evidence that a firearm manufacturer which Browning's President and Chief Executive Officer considered not to be in the "same category as Browning" did not pay excise taxes on the firearm parts and accessories. Moreover, Remington Arms, the competitor that was repeatedly referenced in Browning's marketing division worksheets and relied upon by Mr. Gobel for the setting Browning's prices, responded to the Arthur Andersen survey and indicated that it had paid the excise taxes on parts and accessories. Finally, Browning employees testified that Browning's prices included excise taxes. Although it appears to the court that the market that Browning used to set its prices likely included an excise tax component, the court will consider the relevant factors identified by the *Tenneco* court to determine whether there is other evidence

that would show that Browning did not shift the excise tax to its customers.

**Other Factors**

The *Tenneco* court considered whether there was a correlation between price changes and the application of the excise tax, although this factor often "carries less weight" when the manufacturer utilizes market based pricing. *Id.* at 352. This is so, because, as Mr. Gobel testified, Browning's pricing policies were driven by the highly competitive firearms market and the small amount of excise tax which Browning would pay on individual parts and accessories "would have made no difference whatsoever" on how high or how low he set prices for the coming years. Mr. Keeler, the plaintiff's expert, also testified that the excise tax on parts and accessories would not have affected Browning's pricing decisions since the amount of the excise tax on parts and accessories represented such a small dollar amount. Indeed, as one Federal District Court found:

> While in the instant case, there is almost no correlation between the Plaintiffs' price and the application of the tax, the court finds that this absence of correlation is the result of Plaintiffs' established business practice of maintaining their price in the face of marginally shifting costs. In other words, instead of evidencing Plaintiffs' payment of the tax in question, the Plaintiffs' prices merely serve as an example of their decision to maintain a stable price. Thus, the lack of correlation between the rate of taxation and Plaintiffs' price is ultimately unhelpful.

*Holmes Limestone Co. v. United States*, 946 F.Supp. at 1317. Because the amount of the excise tax on the parts and accessories represents a small fraction of the total cost of the Browning firearms, the court does not consider significant that Browning's prices did not decrease following its understanding that the excise tax did not apply to the parts and accessories.

The court considers significant, however, the testimony of Mr. Bauter, who testified that Browning charged a lower price for its firearms for tax exempt purchasers than non-tax exempt purchasers. Moreover, Mr.

Keeler's expert report stated that it was Browning's policy when arriving at a tax exempt purchase price, to deduct the amount of the excise tax from the wholesale price. The fact that Browning deducted the amount of the excise tax from its wholesale price to establish a sales price for tax exempt customers is evidence that Browning shifted the excise tax to its customers. If Browning did not consider its firearms prices to include an excise tax component, there would have been no need for Browning to set a lower price for tax exempt purchasers.

In its post-trial briefing, the plaintiff argues that: "The key is that Browning Arms started with a market price and then misapplied the excise tax law to that price. As a result, Browning Arms overpaid excise taxes and undercharged exempt purchasers." The plaintiff, however, misstates the circumstances of what was represented by the market price. As found above, the market price that Browning relied upon to set its prices included an excise tax component. Because the plaintiff has failed to establish that the excise tax component of the overall firearm did not include the excise tax on parts and accessories, the plaintiff has failed to show that it did not pass-on the excise taxes paid on the parts and accessories to its customers.

Another factor suggesting that Browning considered excise taxes part of its sales prices is the deduction of the excise tax from Browning's wholesale price list for the calculation of export sales. Browning's Vice President for Firearms testified that he would take the current wholesale prices, deduct the federal excise taxes from the wholesale prices, and occasionally deduct certain dealer discounts, to arrive at the export sales prices. When explaining the calculation of export sales prices, Browning's Vice President of Firearms stated that excise taxes were "built into domestic prices" and that a domestic purchaser could apply to Browning for a refund of the excise tax if the purchaser subsequently sold the firearm in an export sale. Browning's practice of deducting excise taxes from the sales prices of its firearms for export sales further evidences the policy of Browning's shifting of excise taxes to its purchasers. If this was not the case,

no deduction would have been necessary to establish a distinct sales price for export sales. *See GorDag Indus., Inc. v. United States,* 63–2 U.S. Tax Cas. (CCH) ¶ 15,532 at 90,566, 1963 WL 12684 (D.Minn.1963).

In addition, when Browning Arms calculated the constructive sales price in accordance with Revenue Ruling 62–68 for the determination of excise taxes, the plaintiff's calculation originated from the initial assumption that Browning's sales prices for firearms included an excise tax component. First, Browning Arms would determine, for example, Browning's published wholesale price for a long gun, multiply the wholesale price by ninety-five percent, and according to Mr. Walker, "back the excise tax out of that constructive sales price by dividing the constructive sales price in the case of long guns by 1.11. The reason it's 1.11 is because 11 percent of the excise tax rate on long guns." The plaintiff would proceed with the resulting "taxable price of the gun" and multiply the taxable price by eleven percent, yielding the excise tax due on the firearm. Browning's calculation was in accordance with Revenue Ruling 62–68, which dictated that to "back out the excise tax" was only applicable "[w]here the selling company's resale price includes the tax." Rev. Rul. 62–68, 1962–1 C.B. 216. Browning Arms, therefore, conducted these calculations to account for the excise taxes which were included in Browning's wholesale prices, which also included the excise tax on parts and accessories.

Browning's profitability, understood through the treatment of the excise tax in the determination of the production costs of its firearms, also reflects Browning's policy of shifting the excise tax to its customers. This is true because "[c]ost-based factors continue to carry some weight even for taxpayers who set price based on competition. Courts have reasoned that a manufacturer is not likely to continue to produce a product unless the price, whether set by the market or otherwise, covers production costs." *Tenneco v. United States,* 17 Cl.Ct. at 352 n. 9 (citing *Clauson Mfg. Co. v. United States,* 74–2 U.S.T.C. ¶ 16,153, 85,901, 1974 WL 731 (W.D.Ky.1974)). This proposition was supported by the testimony of Mr. Gobel who

testified that although Browning based its prices on the market, production costs played a role in the determination of profitability:

Q. Okay. But you did indicate when you set your prices you wanted, Browning wanted to make a margin; correct?

A. Yes.

Q. And I take it that and you did define a margin as the wholesale price less discounts less direct cost; correct?

A. That is correct.

Q. And Browning's direct cost included the federal excise tax; correct?

A. Yes.

Q. So, therefore, when you looked at in terms—setting prices in terms of making a gross margin you wanted to set the price sufficiently high enough to recover all of Browning's direct costs; correct?

A. That was certainly a goal because we're in business to make a profit. But as you can see by this very sheet that we had the A–500 and both A–500 models were making less than 10 percent margin because those products did not succeed in the marketplace as we anticipated and we could not price them so that they were profitable.

Q. But you were able to price them so that you could recover Browning's direct costs in those forearms; correct?

A. Browning's direct costs, yes.

Q. And you were able to price them so that Browning could recover all of its direct costs, including the federal excise tax; isn't that correct?

A. Yes.

The *Tenneco* court also identified the method a taxpayer accounts for the excise tax as evidence of the taxpayer's shifting of the tax to purchasers. *See id.* at 354 (citing *F & D Trading Corp. v. United States,* 217 Ct.Cl. 472, 484, 580 F.2d 414, 421 (1978)). The accounting method used for the excise tax by Browning was addressed by Mr. Keeler in his export report. Mr. Keeler's report indicated that Browning recorded the excise tax as a cost of its firearms. Whether Browning recorded the excise tax as a cost of the firearm "does not provide conclusive evidence of tax absorption." *Id.* However, unlike

the taxpayer in *F & D Trading Corp. v. United States,* which did not keep an account of manufacturer's excise tax liability on their books, it appears from Mr. Keeler's expert report that Browning accounted for the excise tax as a cost related to the individual firearms. *See F & D Trading Corp. v. United States,* 217 Ct.Cl. at 484, 580 F.2d at 421.

The *Tenneco* court also identified two remaining factors that courts have considered in determining whether a manufacturer has shifted the excise tax to its customers. Whether the taxpayer referenced excise taxes in invoices and sales literature, and whether negotiated contracts included excise taxes. *Id.* at 350. Mr. Keeler testified that Browning's invoices, sales literature, and its negotiated contracts did not reference excise taxes. Although the *Tenneco* court identified these two factors as possible indicators of a taxpayer's policy of absorbing or shifting an excise tax, the *Tenneco* court noted that the factors have "different weight and applicability" depending on the particular taxpayer. The absence of evidence in defendant's favor on these two factors is by no means dispositive in plaintiff's favor. The *Tenneco* court also noted that a "[p]laintiff has the burden of showing that it consistently acted as if it had absorbed the tax." *Id.* at 355. Moreover, "[w]hether or not plaintiff bore the economic burden [of the excise tax] is a factual question." *A.S. Epstein v. United States,* 174 Ct.Cl. at 1174, 357 F.2d at 937; *see also Worthington Pump & Mach. Corp. v. United States,* 129 Ct.Cl. at 93, 122 F.Supp. at 847 ("To find out who bore the burden of tax involves a determination of fact."); *Boyle Valve Co. v. United States,* 69 Ct.Cl. 129, 133–34, 38 F.2d 135, 137 (1930) ("The determination whether the tax was collected by the manufacturer directly or indirectly from the purchaser; that is, whether it was added to the purchase price of the article upon the sale of which the tax was imposed, either as a separate item or as a part of the sales price, is an ordinary question of fact; one with respect of which the courts constantly review the commissioner's determination and one that is involved in almost every suit for refund. It is a question of a type requiring no particular skill or knowledge of accountancy, but merely the ability to weigh evidence and to determine when to believe a witness.").

This court, weighing the competing factors, does not find the absence of a reference to excise taxes in Browning's invoices, sales literature, or negotiated contracts sufficient to support plaintiff's claim that it bore the economic burden of the excise tax.

The evidence offered at trial in this case demonstrates that the plaintiff consistently treated its prices for firearms as including the excise tax component, which also consisted of the excise tax on parts and accessories. First, Browning Arms deducted the excise tax from its prices when calculating its constructive sales price. Second, Browning priced its firearms to recover the excise tax it paid on the firearms. Third, in calculating its prices for tax exempt sales and export sales, Browning consistently deducted the portion of its regular sales price that represented the excise tax on the firearm. Finally, although the plaintiff showed that Browning relied upon the its competitors in the firearms market to set its prices, the plaintiff was unable to demonstrate that Browning's competitor's did not include an excise tax component in the sales price of their firearms.

### CONCLUSION

Pursuant to the discussion above, following trial, the court finds that the plaintiff has failed to establish that Browning's prices for its firearms did not include an excise tax component, which also contained the excise tax on parts and accessories. Because the plaintiff calculated its constructive sales price for the purposes of determining its excise tax liability based on Browning's market prices, which included an excise tax component, the plaintiff did not bear the economic burden of the excise tax. As a consequence, the court need not consider plaintiff's claim that defendant's determination that certain of the parts and accessories for which the refund was claimed were not exempt from excise taxes under 27 C.F.R. § 53.61(b). The Clerk of the Court is directed to enter **JUDGMENT** in favor of the defendant.

**IT IS SO ORDERED.**